We granted certiorari review in order to determine whether the Court of Civil Appeals erred in affirming the trial court's ruling that the plaintiffs are not due an award of attorney fees under the "common benefit" exception to the "American rule." Although summaries of the factual background and procedural history of this case have been presented in Horn v. City ofBirmingham, 648 So.2d 607 (Ala.Civ.App. 1994) ("Horn I"), Horn v.City of Birmingham, 718 So.2d 691 (Ala.Civ.App. 1997) ("Horn II"), and Battle v. City of Birmingham, 656 So.2d 344 (Ala. 1995), a detailed discussion is necessary here.
Browning Ferris Industries of Alabama; Inc. ("BFI"), operates landfills for sanitary waste (hereinafter sometimes referred to as "garbage") in Blount and Walker Counties that are permitted to accept such waste from certain other Alabama counties, including Jefferson County. In 1991, BFI sought to construct a sanitary waste transfer station and recycling center in the City of Birmingham ("the City"). The sanitary waste transfer station was to be a facility where the many BFI trucks collecting garbage from areas of the City would come and dump their loads of garbage inside a large building; the garbage would then be processed by separating recyclable waste from nonrecyclable waste. The nonrecyclable waste would later be transferred to much larger trucks for *Page 696 
transport to distant landfills, and the recyclable waste would be stored on-site for eventual sale.
In January 1991, an attorney representing BFI wrote a letter to Tom Magee, chief planner in the City's Department of Urban Planning, inquiring whether BFI's proposed sanitary waste transfer station and recycling center would require a "special use" zoning permit. The BFI letter stated, in relevant part:
 "It is BFI's intention to purchase property near the University of Alabama [at] Birmingham. The facility that they wish to locate there is called a Transfer and Recycling Facility. The purpose of the operation is this:
 "BFI trucks will deliver garbage and recyclable materials to the facility. A machine will then separate the garbage from the recyclable materials. All the recyclable materials will be placed in the facility and sold to the market as BFI chooses, and all the garbage will be compressed by a machine and then placed on 70 ton trucks. After this process is completed the 70 ton trucks will deliver the compressed garbage to landfill sites in Blount and Walker Counties.
 "As you know, the zoning ordinance under the special exception criteria, authorize[s] a landfill in an M-2 [`heavy industrial'] district with a special use permit. My question to you is whether a facility, such as the one described above, is deemed to be a landfill by the City of Birmingham."
The City's use regulations for a district zoned M-2, heavy industrial, state:
 "A building or premises shall be used only for the following purposes:
 "1. Any use permitted in the M-1 Light Industrial District; except, that no dwelling other than that for a resident watchman, custodian or caretaker employed on the premises shall be permitted.
 "2. Any other use not in conflict with the ordinances of the City of Birmingham regulating nuisances; provided further that no building or occupancy permit shall be issued for any of the following uses until and unless the location of such use shall have been approved by the City Council after report by the Planning Commission in accordance with the procedure set forth in Article V, Section 3:
"a. Abattoir.
"b. Acid manufacture.
"c. Atomic power plant or reactor.
"d. Explosives manufacture or storage.
 "e. Fat, grease, lard or tallow rendering or refining.
"f. Glue or size manufacture.
 "g. Garbage, offal or dead animal reduction or dumping.
"h. Petroleum refining.
"i. Stockyard or slaughter of animals.
"j. Junkyards, salvage yards.
"k. Hazardous waste or toxic disposal.
"l. Medical and infectious materials disposed."
(Emphasis added.) The City's M-1 use regulation allows, among other things, "Manufacturing, fabricating, processing, or assembling uses which do not create an objectionable noise, vibration, smoke, dust, odor, heat or glare." (Emphasis added.)
Later that same month, Magee wrote a response to BFI, stating that it was his opinion that BFI did not need to obtain a special use permit to construct a sanitary waste transfer and recycling facility in an M-2 district:
 "This letter is in response to your recent correspondence regarding Browning Ferris Industries' (BFI) intent to purchase property on the Southside of Birmingham for the purpose of constructing a Transfer and Recycling Facility. As per your letter, BFI trucks will deliver garbage and recyclable materials to this proposed facility, where the garbage and recyclable materials will be separated. All garbage will then be compressed and placed in 22 ton trucks which will haul the garbage to landfills in Blount and Walker Counties.[1] It *Page 697 
is my understanding that the garbage will be processed daily and will not remain on the premises overnight. Your letter also indicated that the recyclable materials will be stored in a separate area and will be sold to the market as needed. It is also my understanding that this entire process of transferring, processing, and recycling of garbage will be completely enclosed within a building, and no hazardous wastes or toxic materials will be processed or stored on the premises. Based on this understanding, this use would not be interpreted to be a sanitary landfill. In addition, the property you have indicated as being utilized for this proposed facility is located north of 6th Avenue, South near the Golden Flake Company and is zoned M-2 (Heavy Industrial District). This Zoning district would allow this facility as a permitted use. Please be advised, however, that no noxious odors, fumes, or noise can be associated with this facility."
(Emphasis added.) At the time Magee wrote this letter, the only knowledge or information he had regarding sanitary waste transfer stations was that presented in BFI's letter to him and in a videotape he had also received from BFI. Magee failed to conduct any further inquiry before providing BFI with his response approving construction of the facility in that M-2 district.
Thereafter, BFI obtained an option from the Golden Flake Company to purchase 10 acres of a 30-acre tract owned by Golden Flake, and BFI submitted for Golden Flake an application with the City to subdivide the property. In March 1992, BFI gave property owners immediately adjacent to the Golden Flake property notice of the intended subdivision of the property for development by BFI as a sanitary waste transfer and recycling station and the City approved subdivision of the property. BFI purchased the subdivided property from Golden Flake in March 1993 and in April BFI announced in a press release that it had obtained all the permits and approvals required by the City for it to construct a garbage transfer station in the Titusville area of Birmingham.
The residents of the primarily African-American Titusville neighborhood first learned of the BFI sanitary waste transfer station through the press release. They objected to the facility's being built adjacent to their neighborhood, and several residents obtained the assistance of attorneys W.L. Williams, Jr., and David A. Sullivan. These Titusville residents and their legal counsel attended the May 11, 1993, meeting of the Birmingham City Council and voiced to the council members their objections to the proposed BFI facility. Council members responded by saying that they had not previously been aware of the pending BFI facility and that they did not believe they could do anything to prevent the completion of its construction. A larger group of Titusville residents, along with residents of Walker County, attended the May 25, 1993, meeting of the city council. During that meeting, the Titusville residents and their counsel voiced continued opposition to the BFI sanitary waste transfer station. Attorney Williams stated that he believed that under the City's M-2 zoning classification a facility such as the one BFI planned to construct required approval by the city council, and he requested that the Department of Urban Planning review the zoning ordinance again. Michael Dobbins, who was director of the Department of Urban Planning and was Magee's supervisor, stated that he believed council approval was not necessary, because he believed the BFI sanitary waste transfer station conformed with the M-2 heavy industrial zoning classification. Dobbins admitted that he had not visited a BFI sanitary waste transfer facility, but stated that if the proposed BFI facility involved the creation of noxious odors, fumes, and/or noise then it would violate the City's nuisance ordinances. Mayor Richard Arrington made a report to the council and informed it that he believed he had no legal basis to deny any further permits to BFI. However, the city council passed a resolution asking the mayor to have the City do whatever was legally possible to prevent BFI from operating a sanitary waste transfer station at the site in question. The following day the City's attorney issued a memorandum to the city council stating that he believed the City could face a multi-million dollar lawsuit if it prevented BFI from *Page 698 
completing construction of the sanitary waste transfer station.
Thereafter, Dobbins wrote a letter to Williams, one of the attorneys for the Titusville residents. Dobbins stated that it was his position that BFI's proposed facility was not a garbage dump and that BFI was not required to receive any further zoning approvals before construction of the facility. It is apparent from Dobbins's letter that he was taking as fact BFI's contention that the garbage transfer station would not create any noise, noxious odors, or fumes that would prevent it from conforming with the M-2 use regulations and thus would not require city council approval. Dobbins stated in his letter to Williams that garbage transfer stations were a new method for handling household wastes and that the nearest one was being operated by BFI in Marietta, Georgia, where it was adjacent to a residential neighborhood. However, there is no indication in the record that Dobbins or any of his staff had visited the Marietta garbage transfer station, or any other operated by BFI, in order to ascertain whether such facilities created noise, noxious odors, or fumes, or in any other way would constitute a nuisance. Also in May 1993, Mayor Arrington wrote to the city council, stating that after consulting with the City's Law Department and the Department of Urban Planning, he was of the opinion that construction permits could not be legally withheld from BFI.
In early June 1993, the Titusville residents appealed Dobbins's decision — that the proposed BFI garbage transfer station did not require approval by the city council in order to be constructed in an area zoned M-2 — to the City's Board of Zoning Adjustment ("the Board"). The construction of the BFI facility adjacent to a residential neighborhood, and the protest of the Titusville residents, had begun to attract substantial attention from the local news media, and at the June 8, 1993, meeting of the city council, one of the council members responded by sponsoring a proposed ordinance that would regulate sanitary waste transfer facilities and would require public notice and public hearings, as well as city council approval, before construction. The ordinance was adopted by the council at the same meeting and was approved by the mayor the following day; however, public notice requirements for approval of the ordinance had not been met and it had to be passed again at a later date, as mentioned below.
The Titusville residents and their counsel, along with numerous supporters, appeared before the Board of Zoning Adjustment on June 10, 1993, to support their appeal; however, the Board upheld Dobbins's decision. Thereafter, on June 24, William Fred Horn and other citizens filed in the Jefferson Circuit Court a "Notice of Appeal of the Decision of the Zoning Board of Adjustment of the City of Birmingham and Complaint for Declaratory Judgment, Petition for Writ of Mandamus and Permanent Injunctive Relief" against the Board, the City, and the mayor ("the Horn, lawsuit"). The Horn filing alleged that Dobbins, as the director of the Department of Urban Planning, was the only person lawfully authorized to administer the City's zoning ordinances and, therefore, that a lesser employee such as Magee was without lawful authority to render an interpretation of the M-2 zoning ordinance when he did so in his January 1991 letter to BFI. The filing further alleged that the construction permits the City had issued to BFI, based on Magee's decision and without city council approval, were unlawful. It requested that the court order the City not to issue any further permits to BFI regarding the facility under construction until its use was approved by the city council. In July 1993, 63 persons from different cities and counties in Alabama moved to intervene as plaintiffs in the Horn
lawsuit. BFI also moved to intervene in the action as a defendant.
In response to extensive and continuing public pressure and media coverage brought by the plaintiffs' litigation against the City, the city council, on August 3, 1993, passed a resolution authorizing the mayor to enter into negotiations with BFI to either purchase the subject property from BFI or to exchange it for other property owned by the City. The mayor and a council member met with representatives of BFI to discuss a purchase of the property by the City, but no *Page 699 
agreement was reached and BFI continued construction of the facility.
On August 27, the plaintiffs filed a motion seeking to compel the City and the mayor to be realigned from defendants to plaintiffs. Negotiations between the City and BFI continued, but failed when the City could not meet BFI's requested price for the facility, $17 million. On September 3, the mayor filed a motion with the circuit court requesting that he be realigned from a party defendant to a party plaintiff, which was granted by the circuit court. That motion stated:
 "Now comes Mayor Richard Arrington, Jr. in his official capacity as Mayor of the City of Birmingham, Alabama, and moves this Honorable Court to realign this defendant as a plaintiff as further described herein. This defendant asserts that new information has been developed during the course of this action. This new information is as follows:
 "1. Contrary to earlier representations, a portion of the garbage collected by Browning-Ferris Industries of Alabama, Inc. will remain on the site more than a few hours. This consists of items salvaged for recycling and of liquid and semi-solid contaminants leaking from the garbage.
 "2. Contrary to earlier representations, this facility, if operated as other similar facilities, cannot be sanitized. Reports from Marietta, Georgia suggested that, with 24 hour operation, full, daily cleaning is either not possible or not effective in eliminating odor.
 "3. It has been reported to me that it is not possible to eliminate possible contaminated liquid drainage on streets and into storm sewers, leading to the facility. This is a special concern since the primary path to the BFI facility is adjacent to a city park and swimming pool.
 "4. Together with the additional information now available, as described herein, in my opinion, this garbage transfer facility does constitute a necessary incident to a garbage dump thereby incurring the requirement that the location of such use be approved by the City Council.
 "5. As a further necessary precondition to the operation of this facility, it is my opinion that the Alabama Department of Environmental Management must review and approve this facility as a necessary incident to a garbage-dump. Any such review or approval is unknown to me.
 "Based upon these facts, I as Mayor, request to be realigned as a plaintiff for the limited purpose of asserting that, based on new information not previously furnished to, or incorrectly furnished to, Mr. Thomas Magee, Mr. Mike Dobbins, and the Zoning Board of Adjustment, this matter must, in accordance with Article III, Section 3.2 of the Zoning Code of the City of Birmingham, be referred to the Birmingham Planning Commission and City Council, and further, that this proposed use, for reasons cited above, will, in my opinion, necessarily constitute a nuisance in violation of Section 11-8-1 of the General Code of the City of Birmingham, 1980, in that this use is likely to be prejudicial to the comfort of and offensive to the senses of the ordinary citizens of the City of Birmingham."
(Emphasis added.)
On September 7, the city council adopted a resolution authorizing the mayor to obtain an appraisal of the BFI property for the purpose of condemning the property. The council also authorized the creation of a committee to investigate the BFI project. BFI responded by suing the City, Mayor Arrington, the city council, and its members, for declaratory and injunctive relief, and for $17 million in damages ("the BFI lawsuit"). In its complaint, BFI alleged that City officials, unfairly exercising political expediency, had illegally conspired to formulate a plan to "kill" its previously approved project.
On September 10, the City made an offer of judgment, per Rule 68, Ala. R. Civ. P., consenting to the entry of a judgment against it and in favor of the plaintiffs in the Horn lawsuit that would require that the matter of BFI's construction permits be returned to the city council for further consideration, requiring council approval before the facility *Page 700 
could begin operating.[2] The plaintiffs accepted the offer of judgment. On September 13, 1993, Judge William A. Jackson, of the Jefferson Circuit Court, entered a final order in the Horn
lawsuit, pursuant to the offer of judgment, requiring that the City refuse to issue construction permits to BFI until the sanitary waste transfer facility obtained the approval of the city council, after public notice and a public hearing. The court ordered that each party bear its own costs. Two days later, the plaintiffs filed a Rule 59, Ala. R. Civ. P., motion with the circuit court, asking the court to alter or amend the judgment so as to award them an attorney fee from the City. The trial court denied the motion and the plaintiffs appealed to the Court of Civil Appeals; that court eventually affirmed the trial court's ruling (see discussion below).
On September 14, the city council adopted an amended version of the solid waste facilities ordinance it had previously adopted in June. That extensive ordinance, governing the permitting and licensing of all commercial solid waste facilities in the City, now appears as § 4-3-31 et seq., General Code of the City of Birmingham. In § 4-3-31, the City made the following findings of fact:
"Section 1. Findings of Fact:
 "It is hereby found and declared that the collection, disposal and utilization of solid waste is a matter of grave concern to all citizens and is an activity thoroughly affected with the public interest and that the health, safety and welfare of the citizens require efficient and safe solid waste collection and disposal and efficient utilization of such waste and all processes associated therewith. The council further finds that the requirements codified in this article promote and protect the health, safety and welfare of the citizens of Birmingham."
(Emphasis added.)
On September 17, the City's attorney wrote BFI a letter in which he invited BFI to petition the City for a special use zoning permit from the Board of Zoning Adjustment, as required by the trial court's judgment in the Horn lawsuit. However, BFI never did so. Instead, BFI attempted to use its own lawsuit against the City to gain approval to operate its garbage transfer station. The City responded to BFI's complaint against it by asserting the Horn lawsuit consent judgment in support of a collateral estoppel and res judicata defense.
On January 13, 1994, Whitlynn Battle, one of the Titusville plaintiffs, moved to intervene in the BFI lawsuit against the City, as a party defendant. Battle sought to protect the judgment she and the other plaintiffs had obtained in the Horn lawsuit. The City, BFI, and Battle entered into mediation, and the BFI
lawsuit was eventually settled, with a consent judgment entered in February 1994; by that settlement BFI was to sell, and the City was to purchase, BFI's property for $6,750,000. Battle, seeking to prevent the City from having to purchase the property from BFI, challenged the judgment by way of a Rule 59, Ala. R. Civ. P., motion and also sought an award of attorney fees in relation to the BFI lawsuit. The trial court denied the motions, and its ruling was eventually upheld on appeal. Battle, supra.[3]
The success of the Horn plaintiffs in preventing the operation of BFI's sanitary waste transfer station, and the City's purchase of the BFI property, was brought to statewide and even international attention. According to the plaintiffs, a Birmingham daily newspaper, the Birmingham News, published more than 90 articles concerning the plaintiffs' fight against the proposed BFI garbage transfer facility, and one Birmingham television station aired approximately 100 stories on that topic. The case was the focus of discussion on the Alabama Public Television Network's news program "For the Record" on November 28, 1995, and the international organization Greenpeace produced a video on the struggle of the Horn plaintiffs entitled, "Not in Anyone's Backyard — the Grassroots *Page 701 
Victory over Browning-Ferris Industries." On the episode of "For the record," Rick Losa, a BFI representative, stated that because of the Horn litigation involving its attempt to operate a garbage transfer station in Titusville, BFI had changed its procedures for locating and constructing such a facility so that in the future public concerns about a proposed location would be considered from the start. The Horn lawsuit was also the topic of one of the 11 chapters in the 1995 academic text "Faces of Environmental Racism" by Dr. Laura Westra and Dr. Peter Wenz, in which those authors concluded that BFI's attempt to locate its garbage transfer facility in the primarily African-American Titusville neighborhood was a clear case of environmental racism.
With regard to the appeal by the Horn, plaintiffs of the trial court's denial of their motion for an award of attorney fees, inHorn I the Court of Civil Appeals remanded the case to the trial court for further proceedings. The Court of Civil Appeals explained:
 "[I]t appears that the trial court was under the impression that it would be an abuse of discretion to award attorney fees when the plaintiffs' efforts had not produced a common monetary fund. Based on our Supreme Court's rationale in Brown [v. State, 565 So.2d 585 (Ala. 1990)], we conclude that the mere fact that the plaintiffs' action did not create a fund from which a fee could be paid should not bar the trial court from awarding attorney fees. The trial court made no findings as to whether the efforts of the plaintiffs' attorneys resulted in a common benefit to the general public. We, therefore, remand this case to the Circuit Court of Jefferson County for it to determine whether the efforts of the plaintiffs' attorneys produced a common benefit and to consider the award of attorney fees. In addition, the plaintiffs are clearly entitled to their costs. Rule 68, Ala. R. Civ. P."
648 So.2d at 610.
On remand, the trial court held a hearing on the issue whether the Horn plaintiffs had produced a common benefit that would support an award of attorney fees. The court listened to arguments from the parties' attorneys, but took no oral testimony. The trial court ultimately denied the plaintiffs an award of attorney fees, and in its October 31, 1995, order the court made the following findings of fact, which were based on the affidavits of Mayor Richard Arrington; Emory Folmar, mayor of Montgomery, Alabama; and Jack Harrison, city attorney for Hoover, Alabama:
 "1. Plaintiffs' acceptance of the City's Rule 68 offer of judgment resulted in very limited relief to the plaintiffs. Battle v. City of Birmingham, [656 So.2d 344 (Ala. 1995)].
 "2. Plaintiffs' complaint with or desire to keep BFI's transfer station out of their neighborhood was a run-of-the-mill zoning dispute.
 "3. Any alleged benefit that was realized from plaintiffs' instituting of this action inured to the benefit of the plaintiffs and/or their neighbors.
 "4. Any alleged benefit that was realized from plaintiffs' instituting of this action did not inure to the citizens or residents of the City of Birmingham that do not live in the Titusville community.
 "5. Plaintiffs have not bestowed a common benefit upon the citizens of Birmingham."
Given those factual findings, and given also the fact that, so far as the trial court knew, attorney fees had never been awarded in a "zoning case" based on the common benefit theory, the trial court concluded that the actions of the plaintiffs had not conferred a common benefit upon all the citizens of Birmingham in the same manner as they had benefited themselves. The court concluded:
 "In summary, in order for the plaintiffs to satisfy the common benefit exception justifying the award of attorneys' fees, they must show that they have accomplished a benefit to society much broader than simply an alleged benefit to a single neighborhood. Indeed, plaintiffs must show that the benefit they received was the same benefit that the group they wish to impose their fees on received. Since the plaintiffs have not met this burden the Court will not grant them an award of attorneys' fees." *Page 702 
 I.
Under the American rule, the parties to a lawsuit bear the responsibility of paying their own attorney fees. However, the law recognizes certain exceptions to this rule, and attorney fees are recoverable when authorized by statute, when provided by contract, or when justified by special equity. Blankenship v.City of Hoover, 590 So.2d 245 (Ala. 1991); Reynolds v. FirstAlabama Bank of Montgomery, N.A., 471 So.2d 1238 (Ala. 1985). In the latter instance, attorneys' fees may be awarded where the plaintiff's efforts are successful in creating a fund out of which the fees may be paid, or when the efforts of the plaintiff's attorneys render a public service or result in a benefit to the general public in addition to serving the interests of the plaintiff. City of Ozark v. Trawick,604 So.2d 360 (Ala. 1992); Brown v. State, 565 So.2d 585 (Ala. 1990);Bell v. Birmingham News Co., 576 So.2d 669 (Ala.Civ.App. 1991). These have been termed the "common fund" and "common benefit" exceptions to the American rule.
The common benefit exception is at issue here; however, the trial court, concluding that the efforts of the plaintiffs' attorneys did not create a benefit common to all the citizens of Birmingham, denied the plaintiffs' request for an award of attorney fees. Whether to award attorney fees is within the sound discretion of the trial court, and the ruling on that question will not be reversed on appeal absent an abuse of discretion.Battle, supra; Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'nof Tuscaloosa County, 632 So.2d 442 (Ala. 1993).
 II.
The plaintiffs contend that the trial court abused its discretion in denying them an award of attorney fees. They say the trial court based its ruling on the fact that attorney fees had never been awarded in a zoning case and they believe its ruling was in error because, they say, under Alabama law, as set out in Brown, supra, and Bell, supra, attorney fees may be awarded in any type of case, even a zoning case, if the efforts of the plaintiffs result in a common benefit to the public. The plaintiffs argue that their efforts resulted in a substantial common benefit to all the residents of Birmingham, thereby entitling them to an attorney fees award.
The plaintiffs first contend that the trial court erred in concluding that there was no common benefit to the public; they say the court's findings on which that conclusion was based are not supported by evidence properly admitted into the record. They argue that the trial judge improperly relied on three affidavits that they claim are inadmissible hearsay; the plaintiffs claim that the affidavits make conclusions based on facts not present in the record. The plaintiffs further argue that the unrebutted evidence of this case, including admissions by the City defendants, proves that their actions conferred a substantial common benefit upon all the residents of Birmingham. They claimed to have benefited Birmingham residents in at least the following ways:
 "1. The Plaintiffs prevented the siting of a garbage plant that would not only have affected their neighborhood, but Glen Iris, Five Points South, University of Alabama at Birmingham, the UAB Hospital, all of the people that used [Interstate Highway] I-65, all of the people who used the public streets of Birmingham, all of the people who used the water and sewer system of Birmingham, and in fact the public in general.
 "2. The Plaintiffs benefited themselves and the general public to whom this garbage facility would have been a public nuisance, as stated by Mayor Arrington in his motion to realign as a party Plaintiff.
 "3. The Plaintiffs benefited themselves as well as the general public when they caused the City to admit that public hearings were required as well as a decision by the City Council before garbage could be sited in any neighborhood, not just Titusville.
 "4. The Plaintiffs benefited themselves as well as the general public when they caused the City to pass new ordinances for the siting of garbage, which included notice and public hearings. The very same relief was requested in the Plaintiffs' complaint and obtained through the order of September 13, 1993, in the trial court. *Page 703 
 "5. The citizens of Birmingham benefited when the Plaintiffs caused the City to follow its own ordinance on siting of garbage.
 "6. The citizens in the state and everywhere citizens live where BFI does business benefited because BFI promised never again to go into communities without first fully informing the general public of its intended use of the subject property for waste handling."
The plaintiffs argue that the trial court erred in categorizing their efforts as a "run-of-the-mill zoning case." They say that the trial judge's finding contradicts his earlier statement that this was a case of first impression in Alabama. As noted in the plaintiffs' above-quoted listing of claimed benefits to the Birmingham general public, they argue that this case involved much more than whether a garbage transfer station would be built in the Titusville neighborhood. They contend that this is a case in which the City defendants sought to evade their legal responsibilities and that the plaintiffs forced the City to acknowledge that existing zoning regulations prohibited the construction of a garbage transfer station in an M-2 district, unless such a use was approved by the city council after public notice and hearings. They further contend that because of their opposition to the City's approval of the BFI facility without public notice and public hearings, and the ensuing public furor it spawned, the City passed an ordinance specifically establishing that no type of solid waste facility could be constructed in any area of Birmingham without first being permitted and licensed by the city council, after public notice and hearings. They contend that their actions provided a substantial benefit to all the residents of Birmingham and that they benefited all residents in the same manner that they benefited themselves.
The plaintiffs argue that the record is replete with evidence supporting their position, including publicly made admissions and legal findings of fact made by the City defendants that directly contradict the City's present position and the trial court's finding that there was no common benefit to Birmingham residents. First, the plaintiffs refer this Court to the affidavits of several Birmingham residents, who were not parties in the action below, who stated that they believed the efforts of the plaintiffs conferred a common benefit upon the residents of Birmingham. Then, in addition to the statements contained in Mayor Arrington's motion to realign as a party plaintiff and in the findings of fact contained in the solid waste facility licensing ordinance now codified at § 4-4-31 of the Birmingham General Code, which are quoted above, the plaintiffs reference numerous statements made by City defendants that the plaintiffs say are admissions that the plaintiffs' efforts resulted in significant relief that conferred a substantial common benefit. Some of the statements by City defendants referenced by the plaintiffs were merely public comments, while others are found in legal documents. The latter group includes:
(1) In the resolution passed by the city council authorizing the mayor to enter into negotiations with BFI to purchase the BFI property, the city council stated, in part:
 "WHEREAS, the construction by BFI, Inc., of a waste transfer facility or recycling facility in the North Titusville community of Birmingham has caused great public concern and turmoil; and
 "WHEREAS, the said construction continues to cause public concern and turmoil; . . ."
(2) In its answer to the complaint in the BFI case, the City asserted the defenses of res judicata and collateral estoppel, which was based on the Rule 68 judgment obtained by the plaintiffs' efforts.
(3) In its answer to the BFI complaint, the City contended that BFI was barred from relief because, it said:
 "[BFI] engaged in a pattern of environmental racism, including but not limited to, in the State of Alabama and in the matters involved in this case. This environmental racism and additional discrimination against lower socio-economic areas violates the laws and Constitution of the State of Alabama and applicable orders and regulations."
The plaintiffs argue that the City is bound by these prior public statements and findings of fact as admissions of fact, and, citing Parr *Page 704 v. Champion Int'l Corp., 667 So.2d 36 (Ala. 1995), and Tittle v.Alabama Power Co., 570 So.2d 601 (Ala. 1990), they say that the affidavit submitted by Mayor Arrington contradicting the above statements, without offering an explanation of his earlier statements, cannot be used to create questions of fact. They contend that the trial court erred in not striking the affidavit and that the court's findings of fact based in part on that affidavit are, therefore, erroneous.
Finally, citing Bullard v. Creative Leasing, Inc.,624 So.2d 199 (Ala.Civ.App. 1993), and Lepeska LeasingCorp. v. State Dep't of Revenue, 395 So.2d 82 (Ala.Civ.App. 1980), the plaintiffs argue that the ore tenus standard of review does not apply to the trial court's findings of fact because the court did not hold an evidentiary hearing, but took the case on submission based on the pleadings, motions, exhibits, and briefs. Thus, they say, there was no oral testimony for which the trial court could judge credibility. The plaintiffs contend that in such a situation thede novo standard of review applies to the trial court's factual findings, and that when such review is applied by this Court to the plaintiffs' evidence described above and to Alabama law regarding awards of attorney fees, it will be apparent that the trial court erred in denying their motion for such an award.
 III.
In response, the City contends that the trial court did not abuse its discretion in denying the plaintiffs' motion for an award of attorney fees, and it argues that this Court should affirm that ruling. It says that there is sufficient evidence in the record to support the court's ruling, and it refers this Court to the affidavits of Mayor Arrington, Mayor Folmar, and attorney Jack Harrison, in which they stated that the plaintiffs' efforts did not confer a common benefit upon Birmingham residents.[4]
Next, the City denies that the plaintiffs' efforts, i.e., their efforts through the Horn lawsuit, were responsible for preventing BFI from operating a garbage transfer facility on the property at issue. It notes that the result of the Horn litigation was that the matter of approval for BFI to operate the facility was to be returned to the city council for further consideration, but ultimately the matter was never brought up before that body. The City says that it made no other promises to the plaintiffs regarding what would happen upon further review by the City. It argues that preventing BFI from operating its garbage transfer facility was actually achieved by a consent judgment entered in other litigation, the BFI lawsuit.
Next, the City argues that the evidence in the record of this case indicates that the plaintiffs did not confer a common benefit upon the residents of Birmingham. It says that underBrown, supra, and Bell, supra,[5] the kind of action that satisfies the "common benefit" requirement is one that stops the violation of a clearly defined state law, and it argues that no violation of a state law or other clearly defined right was ever at issue. It contends that the plaintiffs' lawsuit merely involved the interpretation of one of the City's Zoning ordinances. In addition, the City says that even if the plaintiffs' efforts can be said to have prevented operation of the BFI garbage transfer station, the facility would have had no impact on residents of eastern Birmingham and, thus, that a benefit *Page 705 
was not conferred on all the residents of Birmingham in the same manner as it was conferred on themselves.
The City also attacks the plaintiffs' Rule 39 (k), Ala. R. App. P., statement of facts, arguing that much of the plaintiffs' evidence in the record is unreliable information.[6] The City contends that the affidavits it submitted to the trial court provided a proper basis for the trial court's denial of the plaintiffs' motion for attorney fees.
Finally, the City argues that attorney fees should not be awarded in a case contesting a city's zoning decision without an indication from the legislature that the plaintiffs are entitled to such an award. It then says that Ala. Code 1975, §11-52-81, the statute providing for an appeal of a decision of a zoning board, does not mention that any party is entitled to an award of attorney fees, and it argues that this Court should not read such an entitlement into the statute.
 IV.
We first note that the plaintiffs are correct in their argument that where a trial court does not receive evidence ore tenus, but instead makes its judgment based on the pleadings, exhibits, and briefs, the ore tenus standard's presumption of correctness does not apply to the trial court's factual findings and it is the duty of the appellate court to judge the evidence de novo. Tatev. Kennedy, 578 So.2d 1079 (Ala. 1991); Phillips v. Knight,559 So.2d 564 (Ala. 1990); Sheehan v. Liberty Mut. Fire Ins. Co.,288 Ala. 137, 258 So.2d 719 (1972). The trial court in this case did not receive oral testimony and, thus, that court's findings of fact carry no presumption of correctness. Given a de novo
standard of review, and the body of evidence in the record of this case, we disagree with the trial court's factual findings.
First, the trial judge found that this was a "run-of-the-mill zoning case." Although this case involved a decision by the City of Birmingham's Board of Zoning Adjustment, the circumstances and history of the case described above make it clear that this is not a run-of-the-mill case. This is not a case where the city council granted a special use exception from the M-2 zoning ordinance for the construction a garbage transfer station after public notice and a public hearing, and the plaintiffs succeeded in reversing that decision on appeal to the circuit court, causing a benefit to the residents in that particular area of the City alone. Rather, after the BFI garbage transfer facility had been approved by the City in an M-2 district, without public hearings and city council approval, and the City defendants contended that they could do nothing to prevent operation of the facility, the plaintiffs succeeded in proving that the zoning ordinance required public hearings and city council approval of a special use permit before the BFI facility could operate. Thus, the plaintiffs forced the City to acknowledge and affirm that its residents have certain due process protections in the zoning regulations relating to construction of garbage-related facilities when the City had at first vigorously denied that. The noteworthiness of that fact is evident from the great publicity the case merited during litigation and afterward as the plaintiffs' success reached international audiences.
Next, the trial court found that the plaintiffs' acceptance of the City's Rule 68 offer of judgment resulted in very limited relief to the plaintiffs. On its face, the Horn judgment required that the issue of operation of the garbage transfer facility be returned to the city council. However, a study of the record makes it apparent that because of the plaintiffs' efforts there was so little chance BFI would subsequently receive approval from the city council to operate its garbage transfer station that BFI never applied for a special use permit and never sought city council approval. Instead, BFI pursued a lawsuit against the City, seeking a multi-million-dollar damages award. The City responded by claiming the Horn judgment as a res judicata and collateral estoppel defense to the action. Thus, although it was the consent judgment between BFI and the City in the BFI lawsuit that formally ended the *Page 706 
possibility the BFI garbage transfer facility might one day begin operations, as a practical matter that judgment was the result of the earlier Horn judgment achieved by the plaintiffs. Thus, theHorn judgment did result in substantial relief to the plaintiffs.
Relying on several affidavits submitted by the City, the trial court found that any benefit resulting from the plaintiffs' efforts inured only to their benefit and that of their neighbors and did not inure to the residents of Birmingham living outside the Titusville neighborhood, so that the plaintiffs did not bestow a common benefit upon the all residents of Birmingham. However, the record contains evidence indicating that the plaintiffs' efforts did result in a common benefit to the residents of Birmingham outside the Titusville neighborhood. First, we note that in response to the public interest caused by the plaintiffs' efforts in this case, the City passed a new ordinance specifically regulating and licensing solid waste facilities, such as the garbage transfer station at issue. Although it could be argued that the ordinance did not directly result from the Horn judgment, such an argument takes a narrow view not consistent with the history of this case discussed in detail above. The record reflects that the City's solid waste licensing ordinance is the result of the plaintiffs' efforts in this case. Thus, the plaintiffs' efforts clearly resulted in an increased level of due process protection to all residents of Birmingham. It is highly likely that additional solid waste facilities will be needed in Birmingham in the future, and all of its residents have received a common benefit from the existence of the ordinance.
Moreover, the record contains many statements by City officials such as Mayor Arrington and members of the city council made during the course of this litigation that are consistent with the plaintiffs' claim that they bestowed a common benefit upon the residents of Birmingham and that are inconsistent with the City's present position. For example, as is quoted above, Mayor Arrington, in his official capacity, stated in his motion to realign himself as a party plaintiff that if it was allowed to operate the BFI garbage transfer station would be a public nuisance "prejudicial to the comfort and offensive to the senses of the ordinary citizens of the City of Birmingham." The city council made in its solid waste facilities ordinance a finding of fact that the collection and disposal of solid waste is a "matter of grave concern and is an activity thoroughly affected with the public interest." We take these and other public statements to be evidence that the plaintiffs' efforts bestowed a substantial common benefit upon all the residents of Birmingham.
Although the City has attempted to rebut that evidence by submitting several affidavits, we find each to be flawed. First, Mayor Arrington's affidavit is clearly contradicted by the prior position set out in his motion to realign as a party plaintiff. In Tittle, 570 So.2d at 604, this Court stated: "This Court has held that when a party to an action has given clear answers to unambiguous questions that negate the existence of any genuine issue of fact, that party cannot later create an issue of fact by submitting an affidavit that directly contradicts, without explanation, that earlier testimony." Mayor Folmar's affidavit is based solely on the limited facts of this case contained in theHorn I opinion, and it relates to his experiences in zoning disputes in Montgomery. It is not based on the body of facts contained in the record of this case. Although attorney Jack Harrison's affidavit is of greater weight, it is not controlling over the admissions made by the City defendants during the course of the litigation.
In sum, given our finding that the record contains abundant evidence that the plaintiffs bestowed a common benefit upon the residents of Birmingham, we conclude that the trial court erred in denying the plaintiffs' motion for an award of attorney fees. In Brown, supra, this Court reversed the trial court's denial of an award of attorney fees where the litigants had challenged the validity of the State's practice of trying citizens on unsworn and unverified traffic ticket complaints. In Bell, supra, this Court affirmed the trial court's award of attorney fees to the Birmingham News Company, which had filed an action that enforced statutory requirements that the Birmingham City Council conduct its business in open and public meetings *Page 707 
and that election of city council officers be conducted in public. We conclude that the plaintiffs' efforts similarly "[brought] an end to an improper practice." 576 So.2d at 670-71.
 V.
The Court of Civil Appeals erred in affirming the judgment of the trial court. We remand this cause for that court to enter an order consistent with this opinion.
REVERSED AND REMANDED.
ALMON, SHORES, HOUSTON, KENNEDY, COOK, and BUTTS, JJ., concur.
HOOPER, C.J., and MADDOX and SEE, JJ., dissent.
[1] The record does not indicate why BFI's January 1991 letter to Tom Magee of the City's Department of Urban Planning referred to a 70-ton garbage truck while Magee's letter in response referred to a 22-ton garbage truck.
[2] BFI, an intervenor in the case, was not a party to the offer of judgment.
[3] This Court did not address the merits of Battle's request for attorney fees, affirming the judgment of the trial court because "all of Battle's arguments in support of her request for attorney fees apply solely to her efforts in the Horn case."Battle, 656 So.2d at 347.
[4] The plaintiffs moved the trial court to strike the affidavits, arguing that they were not based on facts in evidence and that they were merely opinions and conclusory perceptions.
[5] The City also cites Alyeska Pipeline Service Co. v.Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141
(1975), for the proposition that attorney fees should not be awarded to the plaintiffs. However, in Mims v. Teamsters LocalNo. 728, 821 F.2d 1568 (11th Cir. 1987), the Court of Appeals stated:
 "In its order denying attorney's fees, the district court questioned the continued efficacy of the Hall [v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973),] Court's common benefit analysis in light of the Court's subsequent decision in Alyeska Pipeline Serv. Co. v. Wilderness Sc'y, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), which denied attorney fees under the `private attorney general' approach, to environmental groups that sued to bar construction of the trans-Alaska oil pipeline. We respectfully disagree with the district court because the `common benefit' exception was not at issue in Alyeska."
821 F.2d at 1570, n. 6.
[6] However, we note that the documents and videotapes the plaintiffs rely on were admitted into evidence by the trial court.