810 So.2d 763 (2000)
STATE BOARD OF EDUCATION
v.
E.B. McCLAIN.
2990242.
Court of Civil Appeals of Alabama.
July 14, 2000.
Rehearing Denied September 1, 2000.
*764 Bill Pryor, atty. gen., and Raymond L. Jackson, asst. atty. gen.; and Michael White and Anita Kelley, Alabama State Board of Education, for appellant.
J. Gusty Yearout, Deborah S. Braden, and John G. Watts of Yearout, Myers & Traylor, P.C., Birmingham, for appellee.
PER CURIAM.
The defendant, the State Board of Education ("the Board"), appeals from an award of an attorney fee for counsel for the plaintiff, E.B. McClain.
On July 26, 1996, McClain, a member of the Alabama Legislature, sued then Governor Fob James, the Board, and the members of the Board in their official capacity. According to the complaint, the Federal Government had established a program known as "Goals 2000: Educate America Act," pursuant to 20 U.S.C. § 5801 et seq., whereby states could receive money for improving public education. The Goals 2000 legislation provided that if a state refused the available moneys, local school boards could apply independently, provided the state's board of education allowed the local boards to make the application. McClain alleged that the Board, acting in an arbitrary and capricious manner, had voted to reject the funds available through Goals 2000 and that the defendants had violated the due-process and equal-protection rights of the citizens of Alabama by arbitrarily and capriciously refusing to accept the funds. He asserted that the Board and its members had also arbitrarily and capriciously voted to refuse to allow local school boards to request money.
On October 2, 1996, the Board moved to dismiss the complaint, arguing that the matters raised were moot, because the Board had voted on August 22, 1996, and September 12, 1996, to accept funds from Goals 2000. The Board also argued that McClain lacked standing to bring the action and that the complaint failed to state a claim upon which relief could be granted. The trial court denied the motion.
On July 6, 1998, the defendants moved for a summary judgment. McClain responded to the motion and filed a motion for an attorney fee and costs, or to allow further discovery as to why the Board members had changed their votes.
On April 5, 1999, the trial court entered a summary judgment in favor of the defendants, but ordered that a hearing be held on McClain's motion for an attorney fee. *765 On May 5, 1999, McClain moved to alter, amend, or vacate the judgment, asking, among other things, that the trial court revise its order to expressly state that the summary judgment was not a final appealable order because the claim for an attorney fee was pending. On May 11, 1999, the trial court revised its order, based on McClain's motion. Following a hearing on June 24, 1999, the trial court awarded McClain a $25,060 attorney fee and $939.94 in costs and expenses. The Board appeals.
"Goals 2000" was passed by Congress in 1994. 20 U.S.C. § 5801. Goals 2000 established the following national education goals to be realized by the year 2000: (1) All children in the United States will start school ready to learn; (2) The national high-school-graduation rate will increase to at least 90%; (3) All students will leave grades 4, 8, and 12 with demonstrated competency in certain specified subjects; (4) Teachers will have access to programs for improving their skills and the opportunity to acquire the knowledge and skills to instruct and prepare students for the next century; (5) American students will be the first in the world in mathematics and science achievement; (6) Every adult American will be literate and able to compete in a global economy and exercise the rights and responsibilities of citizenship; (7) Every school will be free of illicit drugs, violence, and the unauthorized presence of firearms and alcohol and will offer a disciplined environment conducive to learning; and (8) Every school will promote partnerships with parents that will ensure parental involvement and participation in educating their children. 20 U.S.C. § 5812.
Approximately $1.5 million was available to Alabama for the year 1994-95. The money for this first year was essentially a grant to plan what to do with the money in each successive year that it was available. Approximately $5 million to $7 million was available to Alabama in 1995-96. The deadline for accepting the money for both 1994-95 and 1995-96 was June 30, 1996. As the deadline grew closer, Alabama was one of three states that had not accepted any money.
When Dr. Ed Richardson became state superintendent of education in October 1995,[1] there had already been discussions with the Governor's staff about Goals 2000. The Governor is the president of the Board. Dr. Richardson indicated that the two main concerns from the Governor and the Board were that accepting the Goals 2000 funds would obligate Alabama to support the national goals of the program and that the Federal Government would then dictate the state curriculum. Dr. Richardson wanted to spend the funds on technology, because a report from the Southern Regional Education Board had indicated that Alabama was one of several southern states that had done little or nothing with technology in the curriculum. Dr. Richardson discussed concerns over Goals 2000 with several employees of the United States Department of Education, all of whom indicated that courses of study or academic requirements would not be dictated by the Federal Government and that the state would not have to spend any additional funds. According to Dr. Richardson's testimony, Alabama's level of reliance on federal funds for state education is among the highest in the nation and he has never seen any federal funding for education where the Federal Government comes in and dictates how subjects will be taught.
*766 On June 27, 1996, Dr. Richardson asked the Board to accept the Goals 2000 funds at the state level or to allow the local school systems to apply for the Goals 2000 funds.[2] Dr. Richardson noted at the Board meeting that the "Board and the public had been overwhelmed with information that did not apply to Goals 2000 (sexual preference, medically related issues, etc.)." He told the Board that objections to Goals 2000 should be based on what was written about the program and not what had been surmised. Dr. Richardson stated that the Federal Government was often criticized for being "meddlesome," but that a "no" vote from the Board would be the same kind of intrusion on local school systems and that they should be allowed to make their own decisions to accept or to reject the Goals 2000 money.
The Board voted not to allow local systems to independently apply for the funds and not to accept the funds at the state level, with Board members Bradley Byrne, G.J. "Dutch" Higginbotham, Stephanie Bell, David F. Byers, Mary Jane Caylor, and Governor James voting to reject Goals 2000; Willie J. Paul and Sandra Ray voting to accept it, and Ethel H. Hall abstaining.
On July 26, 1996, McClain filed his lawsuit, asking that the defendants be permanently enjoined from denying the public school system the opportunity to apply for Goals 2000 funds. McClain held a press conference immediately after filing the lawsuit. Dr. Richardson learned of the lawsuit from a newspaper. Hall also learned of the lawsuit from the media. It is undisputed that the rejection of the Goals 2000 funds received a great deal of media attention throughout the state. At some point, McClain participated in a televised debate with a Board member regarding the worthiness of Goals 2000.
On July 31, 1996, Byrne wrote United States Secretary of Education Richard Riley, asking, among other things, if the Federal Government could mandate, direct, or control Alabama's curriculum if Alabama applied for and received the Goals 2000 funds. In a letter dated August 2, 1996, the Secretary responded by stating that § 318 of the Goals 2000 Act[3] expressly prohibits the Federal Government from mandating, directing, or controlling any state's curriculum or program of instruction or allocation of state or local resources.
On August 8, 1996, at a regularly scheduled Board meeting, Byrne moved to schedule a meeting on August 22, 1996, to amend the motion adopted on June 27, 1996, regarding the consideration of Goals 2000 funds, by deleting any reference to the rejection of Goals 2000 funds at the state level. Additionally, Byrne stated that a motion would be offered to allow the state to apply for Goals 2000 funds with 100% of the funds used for establishing a competitive grant for local school systems to apply for instructional technology and training. He told the Board that a letter from the Secretary of Education had indicated that the Federal Government could not mandate, direct, or control Alabama's curriculum.
*767 Bell asked if Byrne's intent was to address the same issue previously voted on on June 26, 1996, and she noted that that motion had dealt with the rejection of Goals 2000 money at both the state and the local levels. Byrne responded by saying that his motion was to amend the previous motion by deleting any reference to the rejection of Goals 2000 at the state level and not to reconsider the issue. Byers stated that Byrne's motion was out of order under Robert's Rules of Order. Byers expressed his displeasure about how the motion had been raised and he suggested that Byrne's action was a political attempt to pressure the Board.
Bell stated that the Goals 2000 issue had been addressed extensively and that the documents and letters received over the entire time the issue had been reviewed were the same "mush" that had been heard before and "not a new revelation from Washington." She also cited a statement made by Byrne on July 3, 1996, stating that Goals 2000 was unclear and that efforts to obtain clarification from the United States Department of Education had been unsuccessful. Further, she quoted Byrne as stating that "education did not need the threat of more federal regulation." Bell questioned why Byrne had changed his mind, when no new information had been received from the Secretary of Education. Byrne responded by stating that he would not respond to personal attacks. The Board approved the motion to amend, with the votes as follows: Byrne, Higginbotham, Hall, Paul, Ray, and Caylor in favor of the motion, and Bell and Byers against. At the end of the meeting, Hall thanked McClain for attending.
At the meeting on August 22, 1996, Governor James opened the meeting for a public hearing. Twelve people, including school board members, superintendents, and PTA members, argued that the state could not afford to turn down the funding. Thirteen people, including attorneys, state legislators, parents, and Governor James, warned of ramifications and possible lawsuits if states failed to comply with all the provisions of Goals 2000. Subsequently, the Board adopted a resolution allowing Alabama to apply for Goals 2000 funds. When Dr. Richardson was deposed in March 1998, he stated that the Board had authorized him to apply for Goals 2000 funds every year as long as the funds are available.
At the June 24, 1999, hearing on McClain's motion for an attorney fee, the Board argued that because a summary judgment was issued in its favor McClain was not the prevailing party and therefore was not entitled to an attorney fee. The court stated that it had entered the summary judgment because the issue was moot after the Board had agreed to accept the funds, and that it should have dismissed the case instead. The trial court stated in regard to McClain's lawsuit:
"They brought about the result. I think they participated in bringing about the result. Byrne and that Board there were two members on that Board, Ms. Bell and Mr. Byrne, that carried this state, through a whole long time, up there debating whether or not these funds had horns on them and all of that kind of stuff. And I'm just speaking from what I remember from the press, now. They played that game. Then when this lawsuit was filed, or sometime around that time, Byrne switched over his mind and went back, talking about he wrote up there and got assurance. There was no change in what they from what they already knew. So I'm going to look at it. I'll look at it."
Alabama follows the "American Rule" in regard to an award of an attorney fee. Under the American Rule, the parties *768 to a lawsuit bear the responsibility of paying their own attorney fee. However, there are a few exceptions to this rule. Attorney fees are recoverable when authorized by a statute, when agreed to by a contract, or when justified by a special equity, such as where the plaintiff's efforts are successful in creating a fund out of which the fee may be paid, or when the efforts of the plaintiff's attorneys render a public service or result in a benefit to the general public in addition to serving the interests of the plaintiff. Ex parte Horn, 718 So.2d 694, 702 (Ala.1998), citing City of Ozark v. Trawick, 604 So.2d 360 (Ala. 1992); Brown v. State, 565 So.2d 585 (Ala. 1990); Reynolds v. First Alabama Bank of Montgomery, N.A., 471 So.2d 1238 (Ala. 1985); Bell v. Birmingham News Co., 576 So.2d 669 (Ala.Civ.App.1991). These equitable exceptions are commonly referred to as the "common-fund" and "common-benefit" exceptions to the American Rule. Ex parte Horn, supra.
This case falls under the common-benefit exception to the American Rule; the trial court concluded that the efforts of McClain's attorneys had created a common benefit to the State of Alabama. Whether to award an attorney fee is within the sound discretion of the trial court, and the ruling on that question will not be reversed absent an abuse of discretion. Ex parte Horn, 718 So.2d at 702, citing Battle v. City of Birmingham, 656 So.2d 344 (Ala.1995).
The Board argues that there is no evidence that McClain's lawsuit produced any favorable benefit to the citizens and taxpayers of Alabama. The Board further argues that McClain had to establish a "causal connection" between his lawsuit and the Board's decision to accept the Goals 2000 funds and that a causal connection is established by evidence that the lawsuit was a "substantial factor" or a "significant catalyst" in motivating the Board's action. In support of its argument, the Board cites several cases from the United States Court of Appeals for the Eleventh Circuit and one from the United States Supreme Court. However, all the cases cited by the Board concern the recovery of attorney fees based on federal statutes wherein Congress expressly provided that attorney fees were recoverable under certain circumstances. Farrar v. Hobby, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (recovery of attorney fees under 42 U.S.C. § 1988 for civil-rights lawsuit); Morris v. City of West Palm Beach, 194 F.3d 1203 (11th Cir.1999) (civil-rights case where the issue was whether the plaintiff was a "prevailing party" under the language of 42 U.S.C. § 1988 and other fee-shifting statutes); Royal Crown Cola Co. v. Coca-Cola Co., 887 F.2d 1480 (11th Cir.1989), cert. denied, 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 767 (1990) (antitrust case wherein statute specifically provided that attorney fees are recoverable if the plaintiff "substantially prevails"); Iranian Students Ass'n v. Sawyer, 639 F.2d 1160 (5th Cir.1981) (civil-rights action where attorney fees were requested under 42 U.S.C. § 1988). As noted earlier, there is no statute providing for attorney fees in the present case. Instead, the applicable caselaw concerns the common-benefit exception, and the Board's reliance on federal caselaw interpreting federal statutes is misplaced.
In Ex parte Horn, supra, 718 So.2d 694, the city originally had agreed to allow Browning Ferris Industries ("BFI") to place a waste-transfer station in a "heavy industrial district." Residents from the surrounding area objected and voiced their concerns to the city council, which had planned to allow the facility. The mayor reported to the council that he believed he had no legal basis to deny issuance of the *769 permits to build the facility. The residents' lawsuit succeeded in proving that the zoning ordinances had required public hearings and the city council's approval of a special-use permit before the BFI facility could operate. The lawsuit was the subject of state and national media attention. Although BFI never applied for a special-use permit, because of the unlikelihood of receiving one after all the media attention, the residents' lawsuit brought about a common benefit to all the residents of Birmingham, because their efforts resulted in the adoption of a new ordinance increasing the level of due-process protection for all the residents of the city.
In Brown v. State, supra, 565 So.2d 585, a class-action lawsuit was brought challenging the validity of misdemeanor convictions based on unverified uniform-traffic-ticket complaints. Our supreme court held that although the defendants were not entitled to have their convictions reversed, the defendants' attorneys were entitled to fees, because the litigation had resulted in a benefit to the general public by putting an end to the improper practice of the State's trying a case based upon an unverified traffic-ticket complaint.
Bell v. Birmingham News Co., supra, 576 So.2d 669, involved a newspaper's lawsuit challenging the city council's decision to conduct a closed meeting for election of the council's president and president pro tempore. We held that the trial court did not abuse its discretion in awarding attorney fees to the newspaper, because the citizens had derived a common benefit from the lawsuit. The newspaper obtained an injunction to enforce a statute requiring that all city-council business be conducted openly and not in secret.
In the present case, the benefit to the citizens and taxpayers in Alabama is that by accepting the funds from Goals 2000, the educational system of Alabama was awarded millions of dollars. The issue is whether the lawsuit brought about the reversal of the Board's vote not to accept the funding. Byrne indicated that he changed his mind concerning the funding based on assurances from the Secretary of Education that no "strings" were attached to the funds, and he indicated that he was unaware of the lawsuit at the time he changed his mind. However, McClain held a press conference immediately after he had filed the action. The minutes from the Board's meeting on August 8, 1996, indicate that no new information was learned from the Secretary's letter and that Byrne and other Board members who had changed their minds were bowing to public pressure. McClain was present at the August 8, 1996, meeting. Also, the Goals 2000 legislation specifically provides that if the funds are accepted the Federal Government cannot mandate, direct, or control the curriculum in Alabama or Alabama's program of instruction or its allocation of state or local resources.
We cannot say that the trial court abused its discretion in awarding an attorney fee, because the record contains evidence to support the trial court's finding that the lawsuit conferred a common benefit upon the citizens of Alabama and that the lawsuit and the media coverage it gained helped to bring about the result the State's accepting the Goals 2000 funding.
The Board argues that the trial court erred in ruling that the doctrine of legislative immunity does not apply to bar an award of attorney fees in the present case. It contends that the legislature, through §§ 16-3-11 and 16-3-19, Ala.Code 1975, has delegated its legislative power to the Board in the area of federal funding for education. Section 16-3-11 provides that the Board shall exercise general control and supervision over the public schools of *770 this state. Section 16-3-19 provides that the Board "may" accept federal funds "for the removal of illiteracy, the teaching of immigrants and for other educational purposes" and that the Board "may" make rules and regulations regarding the "expenditures of such funds, such expenditures to be in accordance with the terms of the acts of Congress in making such appropriations."
We agree with the trial court that legislative immunity is not applicable in this case. The question is whether the acceptance of federal funding by the Board is a legislative function. A "legislative function" has been defined as "`[t]he determination of legislative policy and its formation as [a] rule of conduct.'" Point Properties, Inc. v. Anderson, 584 So.2d 1332, 1337 (Ala.1991), citing Black's Law Dictionary (6th ed. 1990). The executive department is "`[t]hat branch of government charged with carrying out the laws enacted by the legislature.'" Id. Administrative acts performed by the executive department are defined as "`[t]hose acts which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body or such as are devolved upon it by the organic law.'" Id.
The exercise of the power to accept federal funds was in the nature of an executive or administrative function of state government. Although the Board passed a resolution accepting such funds, that resolution was not legislative in nature. The Board is charged by law to make decisions on federal funding and, in doing so, it is merely carrying out or executing a law enacted by the legislature.
The Board also argues that the trial court erred in determining that sovereign immunity did not apply in this case. The general rule with respect to sovereign immunity is that Art. I, § 14, of the Alabama Constitution prohibits the State from being made a defendant in any court of this state and means that neither the State nor any individual can consent to a lawsuit against the State. Williams v. Hank's Ambulance Serv., Inc., 699 So.2d 1230, 1232 (Ala.1997), citing Gunter v. Beasley, 414 So.2d 41 (Ala.1982). There are exceptions to the doctrine of sovereign immunity, and one applies in a case where state officials must be compelled to perform their legal duties. Williams. Actions to compel state officials to perform ministerial acts are excepted, as are actions for injunction or damages brought against state officials in their representative capacity and individually, where it is alleged that they acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law. Williams. In Gunter v. Beasley, supra, a former lieutenant governor sued the state treasurer, the state comptroller, and the state finance director, seeking retroactive reimbursement of expenses he had incurred during his previous terms in office. The legislature had passed a resolution authorizing reimbursement of the expenses. The Senate Ethics Committee had set the expenses at a fixed sum of $1,500 per month, and the state comptroller had initially authorized several payments. However, the comptroller stopped payments after the attorney general issued an advisory opinion ruling that the reimbursements were unconstitutional. The trial court determined that the expense allowance had been wrongfully withheld from the former lieutenant governor and entered a judgment against the defendants.
Our supreme court in Gunter v. Beasley noted that although the constitution did not expressly grant the legislature the authority to set an expense allowance for the lieutenant governor by resolution, it did not expressly prohibit the legislature from *771 doing that. The legislature has plenary powers and, without a constitutional prohibition against such action, it was not improper for the legislature to set expenses for the lieutenant governor. The supreme court held that the attorney general was acting under a mistaken impression of law when he advised the comptroller to stop payments to the lieutenant governor and that the defendants, in refusing to make the payments, had failed to perform their legal duties. Accordingly, the court held that the lawsuit was not barred by Art. I, § 14, of the Alabama Constitution.
McClain sued the Board to compel the members to perform their legal duties, and the Board members, as state officials charged with making decisions on federal funding, acted under what amounted to a mistaken interpretation of law in originally voting to deny the funds from Goals 2000. The legislation for Goals 2000 clearly provided that the Federal Government could not dictate Alabama's curriculum if the state accepted the funds. According to the minutes of the Board meeting on August 8, 1996, no new information was learned about Goals 2000 from the Secretary of Education's letter when the Board decided to reverse its earlier decision. It is clear from Dr. Richardson's deposition testimony and the minutes from the June 27, 1996, meeting that the Board was influenced by "a narrow band of the political spectrum" that incorrectly interpreted the acceptance of the funds as an opportunity for the Federal Government to intrude upon Alabama's right to determine its own curriculum.
"[E]ducation is perhaps the most important function of state and local governments." Brown v. Board of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954). We believe this statement holds true today and that the trial court did not abuse its discretion in awarding attorney fees against the Board of Education. The dissent attaches great weight to the use of the word "may" in §§ 16-3-11 and 16-3-19. These statutes setting out the Board's authority do not give the Board the right to act under a mistaken interpretation of federal law or bad faith. The Goals 2000 legislation expressly stated that the Federal Government could not dictate a state's curriculum if the funds were accepted. Before the first vote on the whether to accept the funds, officials with the United States Department of Education had indicated that courses of study or academic requirements would not be dictated by the Federal Government. The Board, rather than relying on the express written law and the assurances of the Department of Education, instead chose to believe, either under a mistaken interpretation of law or for an improper motive, that the Federal Government would control Alabama's curriculum. The trial court found that the lawsuit succeeded in bringing about the desired result of the Board's accepting the funds.
Based on the foregoing, we affirm the trial court's award of the attorney fee.
AFFIRMED.
ROBERTSON, P.J., and YATES and MONROE, JJ., concur.
CRAWLEY and THOMPSON, JJ., dissent.
CRAWLEY, Judge, dissenting.
I agree that the Board is not entitled to legislative immunity; however, I conclude that the Board is entitled to sovereign immunity pursuant to Ala. Const., Art. 1, § 14. I further conclude that the Board's immunity from McClain's lawsuit precludes an award of an attorney fee to him.
The per curiam opinion states that the Board is not entitled to sovereign immunity because McClain's action was one to compel the Board to perform its legal duty *772 to accept the Goals 2000 federal funds and, thus, comes within an exception to § 14 sovereign immunity. See Williams v. Hank's Ambulance Serv., Inc., 699 So.2d 1230 (Ala.1997). Section 16-3-19, Ala. Code 1975, clearly provides that the Board has discretion to accept federal funds for educational purposes. Section 16-3-19 does not impose any legal duty on the Board to accept federal funds.
The per curiam opinion reasons that the Board misinterpreted the federal "law" regarding the use of the Goals 2000 funds. The record does indicate that the Board originally decided that acceptance of the funds would involve a federal mandate into local educational issues, even though the United States Department of Education assured the Board that acceptance of the funds involved no federal mandates.
I conclude that the Board's original reasoning did not involve a misinterpretation of any "law." The per curiam opinion relies on Gunter v. Beasley, 414 So.2d 41 (Ala.1982). The supreme court held in that case that former Lieutenant Governor Beasley could sue state officials who refused to pay him his monthly expense allowance as established by a constitutional act of the legislature. Id. at 48. The court concluded that because the state officials had acted under a mistaken interpretation of law, § 14 sovereign immunity did not bar the action. Id.
Today's per curiam opinion reasons that the Board acted under a mistaken interpretation of lawthe Board originally denied acceptance of the funds because it did not want to have a federal mandate, even though the federal officials assured the Board there was no mandate. This simply is not a mistaken interpretation of law. As stated above, § 16-3-19 gives the Board discretion to accept funds; therefore, the Board's refusal to accept the funds does not provide an exception to its § 14 sovereign immunity.
McClain's lawsuit seeking to have the trial court compel the Board to accept the funds would have been barred by the doctrine of sovereign immunity. During the pendency of the lawsuit, the Board changed its original decision and accepted the federal funds. The trial court then entered a summary judgment for the Board, but it also allowed McClain to recover attorney fees.
When the trial court entered the summary judgment for the Board, McClain's action was moot, because once the Board had accepted the funds there was no justiciable controversy. Also, as stated above, I conclude that McClain never had a cognizable claim because the action is precluded by § 14 sovereign immunity. I acknowledge that the common-benefit theory of recovery of attorney fees is not entirely dependent on the plaintiff's having a successful action, as explained in Brown v. State, 565 So.2d 585 (Ala.1990), which is cited in the per curiam opinion.
I distinguish Brown from this case because the plaintiffs in Brown were not barred by the doctrine of sovereign immunity from challenging their convictions based on unverified complaints. Here, McClain's lawsuit against the Board is barred by § 14 sovereign immunity. To award McClain an attorney fee based on the common-benefit theory is repugnant to public policy. The common-benefit theory is premised on the fact that "the efforts of the plaintiff's attorneys render a public service or result in a benefit to the general public in addition to serving the interests of the plaintiff." Ex parte Horn, 718 So.2d 694, 702 (Ala.1998). McClain filed his lawsuit and focused media attention on the Board's denial of the funds, and the Board, indeed, reversed its original decision and accepted the funds; the Board's change of mind brought millions of dollars for public education.
*773 Even if McClain's actions, by focusing media attention on the Board's denial of the funds, contributed to the Board's eventual acceptance of the funds, I cannot conclude that McClain's attorneys are entitled to an attorney fee for bringing an action that is barred by § 14 sovereign immunity. The record indicates that the public pressure on the Board to accept the funds properly resulted from the media attention on the Board; however, the baseless lawsuit against the Board is not a proper basis for awarding an attorney fee. McClain's lawsuit did not have a legal basis, and to allow his attorneys to recover a fee for work they did on a baseless lawsuit violates the policy of the common-benefit doctrine, and it is especially repugnant to the Alabama Litigation Accountability Act, § 12-19-270 et seq., Ala.Code 1975, which discourages baseless lawsuits by allowing an award of an attorney fee and costs against a litigant who institutes a lawsuit without "substantial justification."
THOMPSON, J., concurs.
NOTES
[1] Before he became state superintendent, Dr. Richardson had been superintendent of the Auburn School System.
[2] The minutes from the Board meeting on June 27, 1996, contain no reference to the Board's discussion of accepting the Goals 2000 money at the state level. This is because on August 8, 1996, a motion was passed to amend the June 27, 1996, motion denying Goals 2000 money by deleting any reference to the rejection of Goals 2000 funds at the state level. However, the vote from June 27, 1996, indicates that the Board had rejected Goals 2000 funds at both the state and the local levels. The August 8, 1996, meeting is discussed later in this opinion.
[3] Now codified at 20 U.S.C. § 5898.