**Raymond LUCIA, individually and on behalf of all others similarly situated, Plaintiff,**

**v.**

**TELEDYNE CONTINENTAL MOTORS and Teledyne Industries, Inc., Defendants.**

---

No. CIV. 99–468–RV–S.

United States District Court,
S.D. Alabama,
Southern Division.

June 22, 2001.

Richard T. Dorman, Esq., David G. Wirtes, Jr., Esq., Cunningham, Bounds, Yance, Crowder & Brown, Mobile, AL, Michael F. Ram, Levy, Ram & Olson, LLP, San Francisco, CA, Harry V. Lehmann, Novato, CA, for Raymond Lucia, Plaintiff.

Patrick H. Sims, Esq., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile, AL, for Defendants.

## ORDER

VOLLMER, Senior District Judge.

This matter comes before the Court on several motions, including Plaintiff Raymond Lucia's Motion to Remand (Doc. 6), which the Court finds dispositive of the matter at hand.[1] In said Motion, Plaintiff argues Defendant Teledyne Continental Motors, Inc., and Teledyne Industries, Inc. (collectively "Teledyne") failed to demonstrate either of the two possible bases by which this Court could properly assume jurisdiction over Plaintiff's state law claims.

Specifically, Plaintiff asserts that no federal question jurisdiction or diversity jurisdiction exists, such that this Court should remand the case back to the Circuit Court of Mobile County, Alabama, the venue in which Plaintiff's *Class Action Complaint* (*"Complaint"*)[2] was originally filed. For the reasons given below, Plaintiff's Motion to Remand is **GRANTED**, based upon the Court's finding that this matter was improperly removed to federal court, a state of affairs which necessarily renders this Court without jurisdiction to decide the matters in controversy.

## I. FACTS

Plaintiff Raymond Lucia owns and operates two aircraft with piston engines containing crankshafts manufactured by Defendant Teledyne Continental Motors Division. This company is a subsidiary of Teledyne Industries, Inc. which manufactures and sells piston powered aircraft engines for installation into general aviation aircraft. On April 19, 1999, Teledyne issued a "Critical Service Bulletin" ("CSB") describing cracks found in two particular surfaces of eight of its engine crankshafts manufactured or reworked during 1998. Plaintiff's two aircrafts' piston engines contained crankshafts manufactured by Teledyne in 1998.

Teledyne's Bulletin (CSB 99–3) detailed an inspection process whereby eligible crankshafts would be examined by Teledyne representatives. The inspection methodology is detailed in words and pictures in the CSB, and in general calls for inspection to occur in the field with the engine still installed on the aircraft. Specific metal surfaces within the engine are then examined by an ultrasonic testing process developed for such situations. If potential problems are revealed by the ultrasonic inspection, the Bulletin calls for the engine to be removed and sent to Teledyne's facilities in Mobile, Alabama. If the ultrasonic inspection reveals no potential problem, the engine is then supposed to be reassembled and returned to service.

On April 22, 1999, the Federal Aviation Administration ("FAA"), acting pursuant to its authority under 49 U.S.C. § 44701,[3]

---

**1.** The remaining motions in this matter are addressed today by the Court in a separate, concurrently issued Order.

**2.** As of today's date, the Court is not aware that a class of similarly situated plaintiffs has ever been certified in this matter. What is clear, however, is that Plaintiff Lucia is the only plaintiff to have been implicated in this Court's jurisdiction, which, as already noted, the Court finds today to have been improvidently exercised. This Order therefore refers only to those claims advanced by Plaintiff Raymond Lucia in case style: CV–99001339–CNG, *Class Action Complaint*, docketed April 23, 1999, in the Circuit Court of Mobile County, Alabama, and subsequently removed to this Court by Teledyne's *Notice of Removal* of May 16, 1999 (Doc. 1).

**3.** Section 44701 reads, in pertinent part: (a) Promoting safety—The Administrator of the Federal Aviation Administration shall pro-

issued a "Priority Letter Airworthiness Directive" ("AD") (No. 99–09–17).[4] In that AD, the FAA mandated ultrasonic inspections of covered crankshafts in accordance with Teledyne's CSB. The AD further states that "The FAA has reviewed and approved the technical contents of Teledyne Critical Service Bulletin 99–3 . . . ." *FAA AD 99–09–17*, 2nd para.

Subsequent to learning of Teledyne's issuance of a CSB, Plaintiff filed a claim against Teledyne in the Circuit Court of Mobile County, Alabama, requesting, *inter alia*, injunctive relief in the form of "magnaflux testing" of the allegedly faulty components, and, compensatory damages "not in the excess of $70,000 per class member, attorneys' fees from the common fund, interests and costs." *Complaint*, Circuit Court of Mobile County, Alabama, CV–99001339–CNG. The four causes of action asserted in said *Complaint*, filed one day after the FAA issued its AD, are 1) Misrepresentation 2) Negligence 3) Strict Liability and 4) Breach of Express Warranty. *Id.*

On May 16, 1999, Teledyne filed its *Notice of Removal* (Doc. 1) to this Court, claiming the Court has subject matter jurisdiction over the matter based upon the presence of a federal question, or in the alternative, on the existence of complete diversity between the parties. The Court now examines these claims in depth.

## II. DISCUSSION

"Federal courts have limited subject matter jurisdiction, or in other words, they have the power to decide only certain types of cases." *Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1260–61 (11th Cir.2000) (*citing University of South Alabama v. American Tobacco Co.*, 168 F.3d 405, 409–10 (11th Cir.1999)). Lower federal courts can exercise this power only over cases for which there has been a congressional grant of jurisdiction, *see id.*, "[a]nd because the Constitution unambiguously confers this jurisdictional power to the sound discretion of Congress, federal courts should proceed with caution in construing constitutional and statutory provisions dealing with [their] jurisdiction." *University of South Alabama*, 168 F.3d at 409 (*citations and internal marks omitted*).

Section 1441 of Title 28 provides that in order for an action to be removed to

mote safe flight of civil aircraft in air commerce by prescribing -

(1) minimum standards required in the interest of safety for appliances and for the design, material, construction, quality of work, and performance of aircraft, aircraft engines, and propellers;
(2) regulations and minimum standards in the interest of safety for -
(A) inspecting, servicing, and overhauling aircraft, aircraft engines, propellers, and appliances . . . .

**4.** The Eleventh Circuit, in *Crigler v. Cessna Aircraft Co.*, described airworthiness directives ("ADs") as follows:

Airworthiness directives are mandatory regulations promulgated by the FAA and are binding on owners, operators and manufacturers. *See* 14 C.F.R. secs. 39.3, 39.1; *Piper*

*Aircraft Corp. v. Seven Bar Flying Serv., Inc.*, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984); An owner or operator is required to keep records regarding any maintenance programs required by ADs, including how the compliance was accomplished, the AD number and, if recurring maintenance is required, when the next maintenance must occur. 14 C.F.R. secs. 91.163(a), 91.173(a)(2)(v). Most importantly, ADs are published in the Federal Register; and, as mandatory agency rules and regulations, publication therein acts as legal notice to owners and operators. *See generally* 49 U.S.C.A. secs. 1421, 1423; *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). As such, ADs are binding on owners and operators as part of the general safety regulatory powers of the FAA.
*Crigler*, 830 F.2d 169, 171 (11th Cir.1987).

federal court it must have been possible for it to have been brought there in the first instance. 28 U.S.C. § 1441(a); *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987). As either of the two sources of subject matter jurisdiction, federal question or diversity jurisdiction, exist only where granted by statute, a federal court is not bound by the jurisdictional contentions of the parties. *See Morrison*, 228 F.3d at 1261; *Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1000–01 (11th Cir.1982) ("The jurisdiction of a court over the subject matter of a claim involves the court's competency to consider a given type of case and cannot be waived or otherwise conferred upon the court by the parties.").

Since a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises. See *Fitzgerald v. Seaboard Sys. R.R., Inc.*, 760 F.2d 1249, 1251 (11th Cir. 1985) ("A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises."); *see also Morrison*, 228 F.3d at 1261–62 (raising *sua sponte* on appeal the issue of whether the case involved a sufficient amount in controversy for diversity jurisdiction); *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873–74 (10th Cir.1995) (*same*).

As described above, Teledyne in its *Notice of Removal* asserts this Court may properly exercise jurisdiction over the referenced cause of action originally filed by Plaintiff in the Circuit Court of Mobile County, Alabama. Plaintiff has explicitly challenged this Court's jurisdiction by way of his Motion to Remand. Such a motion belies the need for the Court to raise the issue of jurisdiction *sua sponte*, as the issue has now been placed in controversy. Turning now to Plaintiff's Motion, the Court first examines the requirements incident to a showing of proper diversity jurisdiction.

### A) Diversity Jurisdiction

The foundation for federal court diversity jurisdiction—the power to decide cases between citizens of different states—is Article III of the United States Constitution. *U.S. Const.* art. III, § 2; *see generally Smith v. GTE Corp.*, 236 F.3d 1292 (11th Cir.2001). However, when Congress created the lower federal courts, it limited their diversity jurisdiction to cases in which there was a minimum monetary amount in controversy between the parties. *See Snyder v. Harris*, 394 U.S. 332, 334, 89 S.Ct. 1053, 1056, 22 L.Ed.2d 319 (1969). Today, the threshold amount in controversy for diversity jurisdiction, excluding interests and costs, is $75,000. *See* 28 U.S.C. § 1332.

In *Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir.2000) ("*Cohen II* "), the Eleventh Circuit held that a prior panel decision by the Former Fifth Circuit, *Lindsey v. Alabama Tel. Co.*, 576 F.2d 593 (5th Cir.1978), precluded aggregating punitive damages to establish diversity jurisdiction over a class action. *See Cohen II*, 204 F.3d at 1073–77.[5] Though not addressing precisely the set of facts at issue, the holding is in accord with the rule that, generally speaking, when a set of plaintiffs join in one lawsuit, the value of their claims may not be added together, or "aggregated," to satisfy the amount in contro-

---

5. Decisions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent on the courts comprising the Eleventh Circuit. *See*

*Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

versy requirement for diversity jurisdiction. *See Zahn v. International Paper Co.,* 414 U.S. 291, 295, 94 S.Ct. 505, 508, 38 L.Ed.2d 511 (1973); *Snyder,* 394 U.S. at 335, 89 S.Ct. at 1056.

In this matter the compensatory, or actual damages of Plaintiff (or any other hypothetical class member) appear to be relatively small. According to Plaintiff, the alleged damages suffered include those costs incident to the proper inspection and repair of the allegedly faulty crankshafts, as well as those costs attaching to the loss of use of Plaintiff's aircraft. These costs Plaintiff values to be not in excess of $70,000. *See Complaint, supra.* In any event, assuming *arguendo* that a class could eventually be certified in this matter, the compensatory (or punitive if pled) damages claims could not be aggregated to form the basis for federal diversity jurisdiction, since any of the claims of this hypothetical class would arise from those class members' separate and individual agreements with Teledyne. *See Zahn,* 414 U.S. at 294, 94 S.Ct. at 508. Though the point is somewhat moot as only Plaintiff Lucia's claims are before this Court, such claims as would arise from various class members could not be aggregated for amount in controversy purposes. *Id., see also Morrison,* 228 F.3d at 1263–64.

It is possible, however, that "when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount." *Zahn,* 414 U.S. at 294, 94 S.Ct. at 508 (distinguishing between the "common and undivided" interest, for which aggregation is permissible, and "separate and distinct" interests, for which aggregation is not permissible) (*quoting Troy Bank of Troy, Indiana v. G.A. Whitehead & Co.,* 222 U.S. 39, 40–41, 32 S.Ct. 9, 56 L.Ed. 81 (1911)).

### 1. *Attorney's Fees*

Attempting to fit within the line of cases just cited, Defendant Teledyne argues in its *Opposition to Plaintiff's Motion to Remand* (Doc. 20) that the applicable precedents "hold that class-action common-fund attorney's fees should be aggregated for purposes of determining the jurisdictional amount in controversy." *Id.* at 20. Teledyne refers to the injunctive relief count of the *Complaint,* in which Plaintiff asks for an award of attorney's fees. The Court now addresses this argument.

■ Alabama follows the "American Rule," which generally requires each party to pay its own attorney's fees. *See Ex Parte Horn,* 718 So.2d 694, 702 (Ala.1998). Further, "when there is no direct legal authority for an attorney's fee, a request for a fee [may not] be included in the computation o[f] the jurisdictional amount." *Galt G/S v. JSS Scandinavia,* 142 F.3d 1150, 1155 (9th Cir.1998) (quoting Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3712 at 178 (3d ed.1985)). There is an exception to the "American Rule," and thus, "direct legal authority" supporting inclusion of a claim for attorney's fees in determining the amount in controversy, when an award of fees is authorized either by statute or contract. See *Graham v. Henegar,* 640 F.2d 732, 736 n. 9 (5th Cir.1981) (*citations omitted* ).

■ In this case, Plaintiff does not claim a statutory or contractual right to attorney's fees. A clearly established common law basis for awarding attorney's fees, however, may also justify including a reasonable estimate of requested attorney's fees in determining the amount in controversy. *See Ross v. Inter–Ocean Ins. Co.,* 693 F.2d 659, 661 (7th Cir.1982) (noting that a reasonable estimate of attorney's fees may be included in the amount in controversy "where a litigant has a right,

based on contract, statute, or other legal authority, to an award of attorney's fees if he prevails in the litigation"); 14B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3702 at 92–93 & n. 83 (3d. ed.1985).

As determined by the Eleventh Circuit in *Davis v. Carl Cannon Chevrolet–Olds, Inc.*, 182 F.3d 792 (11th Cir.1999), Alabama recognizes two closely related equitable doctrines providing for an award of attorney's fees: the "common fund" doctrine and the "common benefit" doctrine.[6] *See id.* at 795. Under the common fund doctrine, when litigation generates a fund benefitting a class of individuals, as in a typical class action, the court may award fees to the plaintiff's attorney, usually by deducting a percentage from the fund in order to compensate the plaintiff's attorney. *See Union Fidelity Life Ins. Co. v. McCurdy*, 781 So.2d 186, 188–89 (Ala. 2000); *see also Edelman & Combs v. Law*, 663 So.2d 957, 958 (Ala.1995) ("[T]his Court, like the federal courts, has long recognized that a lawyer who recovers an award for the benefit of a class of clients is entitled to a reasonable fee from the amount recovered.") (*citations omitted*).

The common benefit doctrine, under Alabama law, allows a court to require the defendant to pay attorney's fees, regardless of whether a fund has been generated by the litigation, when the litigation has "conferred some kind of benefit on the public." *Davis*, 182 F.3d at 795 (*citing Brown v. Alabama*, 565 So.2d 585, 592 (Ala.1990)); *see also Horn*, 718 So.2d at 702 (indicating that fees may be awarded under the common benefit doctrine when "the efforts of the plaintiff's attorneys render a public service or result in a benefit

to the general public in addition to serving the interests of the plaintiff").

■ In this case, Defendant argues that the potential Plaintiffs in this case will be entitled to an award of attorney's fees under the common fund doctrine, and that given the potential size of the class, the amount in controversy will have been met to establish diversity jurisdiction. Notwithstanding the fact that the 'class' in this matter consists only of Plaintiff, this position has already been rejected by the United States Court of Appeals for the Eleventh Circuit. In *Davis v. Carl Cannon Chevrolet–Olds, Inc., supra*, a diversity suit involving Alabama state law, the Eleventh Circuit held that a requested award of attorney's fees deducted from the recovery of a common fund could not be viewed in the aggregate to satisfy the amount in controversy requirement for a class action. *See id.*, 182 F.3d at 796–98. Thus, if the common fund doctrine applies, the estimated amount of attorney's fees in this case, like any accompanying claim of punitive damages, for example, must be divided pro rata among each class member. Because any attorney's fees attributed to the as-yet undetermined class members may not be aggregated for purposes of diversity, Teledyne's claim under the common fund doctrine fails to establish diversity jurisdiction in this case.

### 2. *Injunctive Relief*

■ In its *Notice of Remand*, Teledyne reasons that "the amount in controversy [could also be satisfied] in light of plaintiff's demand for mandatory injunctive relief [in the form of an] ... order compelling Teledyne to abandon the remedial

---

6. "In an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto ... should

be followed." *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975) (*citations and quotations omitted*).

approach called for in the CSB ...." *Id.* at 7 (arguing the "cost of such an effort exceeds $75,000."). In the *Complaint,* Plaintiff requests that a court of appropriate jurisdiction declare that Teledyne must carry out specific metallurgical tests on the aviation hardware components it placed or caused to be placed into the marketplace. Aside from the question of whether such an order, if issued by a state court, would conflict with the Advisory Directive issued by the Federal Aviation Administration in this matter,[7] the Court finds that such costs as Teledyne would incur (as a result of compliance with such an order) cannot serve as the basis for satisfying the amount in controversy requirement of federal diversity jurisdiction.

Such costs as Defendant Teledyne would incur by conducting the metallurgical tests demanded by Plaintiff are not a proper measure of the amount in controversy; rather "the value of the requested injunctive relief is the monetary value of the benefit that would flow to the plaintiff if the injunction were granted." *Cohen II,* 204 F.3d at 1077 (*discussing Ericsson GE Mobile Communications, Inc. v. Motorola Communications & Elecs., Inc.,* 120 F.3d 216, 218–20 (11th Cir.1997)). The monetary value of the injunction to Plaintiff, the proper measure, is the value of the services rendered in examining and/or replacing the identified aviation component present in Plaintiff's airplanes. As noted above, Plaintiff's *Complaint* explicitly states that the value of said services caps at $70,000. Even assuming a class of individuals owning airplanes with the same allegedly faulty engine components were to be approved and certified in this matter, it is abundantly clear that as to any individual class member, the monetary benefit would be well below $75,000.

Of course, if the costs of the injunction could be aggregated as to all potential plaintiffs, given the potential size of the class [8] in this matter, the injunctive relief sought in this case would satisfy the amount in controversy requirement. As explained recently in the *Morrison* decision, however, aggregation depends on the rights asserted by the plaintiffs, and not the particular type of relief sought. *See Morrison,* 228 F.3d at 1271. As previously noted, aggregation is permissible only when multiple plaintiffs seek to "enforce a single title or right, in which they have a common and undivided interest," *Zahn,* 414 U.S. at 294, 94 S.Ct. at 508, and thus, "when an injunction protects rights that are separate and distinct among the plaintiffs, the value of the injunction to the individual plaintiffs may not be aggregated to sustain diversity jurisdiction." *Morrison,* 228 F.3d at 1271 (*citing Alfonso v. Hillsborough County Aviation Auth.,* 308 F.2d 724 (5th Cir.1962)).

In this case, a state court granting the type of injunction prayed for in Plaintiff's *Complaint* would protect the individual rights of those qualifying class members,

---

7. While the FAA did issue an AD approving and mandating compliance with the diagnostic procedures outlined in Teledyne's CSB (Teledyne's designated procedure does not include any provision for the advanced metallurgical tests referred to in Plaintiff's *Complaint*), the AD nowhere forbids Teledyne from taking *additional* measures to ensure the viability of its aviation hardware components, nor does it state that the procedures approved by the AD could not operate concurrently with other appropriate safety measures and/or repair schemes issued by a body with proper jurisdiction.

8. Teledyne estimates 2,200 affected crankshafts, resulting in injunctive relief costs of up to $154 million, calculated by pooling the aggregate demand (using a $70,000 cap) of each affected plaintiff. Defendant's *Opposition to Plaintiff's Motion to Remand,* pp. 23–24.

rights which have their basis in the individual ownership of specific aviation hardware components contained within individually owned airplanes. The only link between any given set of potential plaintiffs in this matter is that their aviation hardware has its manufacturing origin in Teledyne Motors; contrary to Teledyne's assertions, this link does not suffice for purposes of aggregation. For when a given class of plaintiffs assert rights that arise from individual contracts with a defendant, those rights are separate and distinct, and thus, their claims may not be aggregated. *See, e.g., Oliver v. Alexander,* 31 U.S. (6 Pet.) 143, 145–48, 8 L.Ed. 349 (1832) (joint suit by seamen to collect wages under their individual· employment contracts); *Morrison,* 228 F.3d at 1271 (class action involving individual insurance policies); *Alvarez v. Pan American Life Ins. Co.,* 375 F.2d 992, 993 (5th Cir.1967) (same).

The allegations by Teledyne that the aviation components are part of a single and distinct product line does not change the separate and distinct nature of the rights that could be asserted in this matter, assuming *arguendo* that a class could eventually be certified in this matter. *See Eagle Star Ins. Co. v. Maltes,* 313 F.2d 778, 780 n. 4 (5th Cir.1963) ("Federal Rule of Civil Procedure, [R]ule 20 allows the joinder of parties plaintiff when there is a common question of law or fact and the claims of all plaintiffs arose out of the same transaction o[r] occurrence. However, this joinder for convenience of the court affects in no way the entirely separate question of aggregation of claims to satisfy the jurisdictional amount."). Accordingly, and for the reasons outlined above, the Court finds that Teledyne has failed to demonstrate the amount in controversy for purposes of establishing diversity jurisdiction in this matter.[9]

## B) Federal Question Jurisdiction

Defendant also asserts that the Court has original subject matter jurisdiction over this case, pursuant to 28 U.S.C. § 1331, because of the presence of a federal question. Teledyne argues that, since this lawsuit seeks compensatory and actual damages in an area of law which, according to Defendant, has been super-preempted by virtue of Congress' delegation to the Federal Aviation Administration, the Court therefore has proper jurisdiction. Defendant's field preemption argument operates on the assumption that any and all judicial intervention into actions even tenuously affecting issues involving the proper maintenance, repair and/or general safety regulation of aviation hardware must necessarily be of the federal type. This assumption fails to recognize, however, that the statutory grant to the FAA of exclusive federal regulatory power in the field extends only to those matters having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart. 49 U.S.C.A. § 41713. The Court will address this argument more fully below. Alternatively, Defendant argues that by seeking injunctive relief to be issued by a state court in order to compel Teledyne to enact safety and inspection measures beyond the scope of those specifically approved in the FAA's AD of April 22, 1999, Plaintiff has bestowed federal question jurisdiction on the Court by operation of ordinary preemption.

### 1. *Removal*

Under the federal question jurisdiction statute, 28 U.S.C. § 1331, a district court has subject matter jurisdiction over "all

9. As determining the parties' citizenship for purposes of diversity would not affect the outcome of this case, the Court declines to address the issue.

civil actions arising under the Constitution, laws, or treaties of the United States." Whether a claim arises under federal law for purposes of 28 U.S.C. § 1331 is generally determined by the well-pleaded complaint rule, "which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar*, 482 U.S. at 392, 107 S.Ct. at 2429. A well-pleaded complaint presents a federal question where it "establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 27–28, 103 S.Ct. 2841, 2856, 77 L.Ed.2d 420 (1983).

■■■ A case may not be removed to federal court on the basis of a federal defense to a state law cause of action. *Caterpillar*, 482 U.S. at 393, 107 S.Ct. at 2430. This rule exists because while "such allegations show that very likely, in the course of the litigation, a question under the Constitution would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under the Constitution." *Franchise Tax Board*, 463 U.S. at 10–11, 103 S.Ct. at 2846–2847 (quoting *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908)). Federal preemption is ordinarily asserted as a defense to the allegations of a complaint and therefore does not usually form the basis for removal. *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987); *Allstate Insurance Co.*, 879 F.2d at 93. "State courts are competent to determine whether state law has been preempted by federal law and they must be permitted to perform that function in cases brought before them .... " *Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R. Co.*, 858 F.2d 936, 942 (3rd Cir.1988).

The *Complaint* in this case does not establish a basis for federal question jurisdiction, because it contains only state law causes of action [10] and does not show that any "substantial question of federal law" is necessary for the plaintiffs to obtain their requested relief. *See id.* The question of whether a given Alabama state court may properly exercise some form of judicial regulation in the realm of aviation hardware safety, or whether such attempts in this area must always be preempted, arose not from Plaintiff's *Complaint*, but rather from *Defendant Teledyne's* invocation of the primary jurisdiction doctrine in defense. As the Supreme Court stated in *Franchise Tax Bd.*, federal question jurisdiction exists only when "the *plaintiff's* complaint establishes that the case 'arises under' federal law." *Id.* at 10, 103 S.Ct. at 2847 (*emphasis in original*)(" '[A] right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.' ")(*citation omitted*). At this juncture, before turning to Defendant's preemption arguments in greater detail, a short survey of the relevant FAA statutory scheme is in order.

2. *Regulatory Scheme of the Federal Aviation Act*

In 1938, Congress promulgated the Civil Aeronautics Act of 1938, Ch. 601, 52 Stat.

---

**10.** In his *Supplemental Brief in Support of Plaintiff's Motion to Remand* (Doc. 21), Plaintiff contends, *"In no way do any of these allegations of misrepresentation, negligence, strict liability or breach of express warranty challenge anything about what the Federal Avi-* ation Administration decided to do." *Id.* at 3 (referring to the FAA's Advisory Directive which approves of and substantively adopts Teledynye's proffered Critical Service Bulletin, *supra* ) (*emphasis in original* ).

973 (1938). *See, e.g., Vail v. Pan Am Corp.,* 752 F.Supp. 648 (D.N.J.1990). Under the Civil Aeronautics Act, the Civil Aeronautics Authority, renamed in 1940 to the Civil Aeronautics Board (the "CAB"), was created and vested with the authority to regulate commercial aviation. *Id.* at 652. Section 411 of the Civil Aeronautics Act gave the CAB the power to determine if a carrier engaged in unfair or deceptive practices or unfair competition. *Id.* (*citation omitted*). The Federal Aviation Act of 1958, Pub.L. No. 85–726, 72 Stat. 731 (1958) (the "Act"), codified as amended at 49 U.S.C.A. § 40101 *et seq.,* created the Federal Aviation Agency and vests "plenary authority to make and enforce safety regulation governing the design and operation of civil aircraft" in the Secretary of Transportation ("the Secretary"). *See* H.R.Rep. No. 2360, 85th Cong., 2d Sess. 2 (1958), reprinted in 1958 U.S.C.C.A.N. 3741, 3741–42. This delegation gave the Secretary the authority and the duty to regulate aircraft safety, including the duty to promulgate "such· minimum standards governing the design, materials, workmanship, construction, and performance of aircraft ... as may be required in the interest of safety." 49 U.S.C.A. § 44701(a).

Congress also created an inspection and certification system which enables the Secretary to enforce federal aircraft design standards. See *Public Health Trust of Dade County, Fla. v. Lake Aircraft, Inc.,* 992 F.2d 291 (11th Cir.1993). The Secretary has done this through the FAA in the form of comprehensive Federal Aviation Regulations (FARs), and as already mentioned, through the issuance of Advisory Directives. As these regulatory tools indicate, the federal government exercises broad controls over the field of aircraft design and safety such that the regulation of each of these has traditionally been a matter of federal concern. Federal concern notwithstanding the unamended Act left considerable power to the states. It

did so by containing a broad general remedies "savings clause." *See* 49 U.S.C. s 1506, Pub.L. No. 85–726, Title XI, § 1106, Aug. 23, 1958, 72 Stat. 798, *repealed* by 49 U.S.C. § 7(b), Pub.L. No. 103–272, 108 Stat. 1379 (1994) (codified and amended to read "A remedy under this part is in addition to any other remedies provided by law" at 49 U.S.C.A. § 40120(c)). The old savings clause provided: "[n]othing in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

The Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705 (1978) (the "Deregulation Act") added section 105 (now codified at 49 U.S.C.A. § 41713), the federal preemption provision. *Vail,* 752 F.Supp. at 652 (*citation omitted*). The House Committee on Public Works and Transportation intended section 105 to "prevent conflicts and inconsistent regulations by providing that when a carrier operates under authority granted pursuant to title IV of the Federal Aviation Act, no State may regulate that carrier's routes, rates or services." H.R.Rep. No. 1211 at 16; 1978 U.S.Code Cong. & Admin. News 3737 at 3752. The Deregulation Act also contained "sunset provisions" which terminated some authority of the CAB and transferred some authority of the CAB to the Department of Transportation (the "DOT"). *Vail,* 752 F.Supp. at 653.

The Civil Aeronautics Board Sunset Act of 1984, Pub.L. No. 98–443, 98 Stat. 1703 (1984) (the "Sunset Act") terminated or transferred the remaining authority and functions of the CAB and provided for its demise. *Id.* It also provided for the transfer of the authority of the CAB neither terminated nor transferred by January 1, 1985 to the DOT. *Id.* The Sunset Act retained in substance the content of section

105 which is now codified at 49 U.S.C.A. §§ 40102 and 41713, respectively. *Id.*[11]

Relevant by way of example, the Aviation Act contains a judicial enforcement provision which sets forth which parties may initiate actions in federal court to enforce the Act's provisions. 49 U.S.C.A. § 46107(a).[12] Under this section, the Board or Secretary of Transportation or their agents may sue to enforce any provision of the Aviation Act, the Attorney General may only sue to enforce section 40106(b), and "any party in interest" may sue to enforce section 41101(a), requiring air carriers to be certified as a condition for operation.[13] The Aviation Act therefore only arguably provides an express cause of action to private parties (the term "private party in interest" is not defined by the Aviation Act) under section 41101(a) and not under sections 41712 or 41702. *See Vail,* 752 F.Supp. at 654.

▮ The argument that Congress did not wish to federalize a private remedy for claims such as the one now presented by

Plaintiff finds support in the existence of an express or implied legislative intent to create private remedies relating to other parts of the statute, since the Aviation Act establishes an extensive and detailed scheme of administrative enforcement complete with civil and criminal penalties, on-going regulation, and agency power to seek enforcement of the Act through injunctive relief. See *In re Mexico City Aircrash of October 31, 1979,* 708 F.2d 400, 407 (9th Cir.1983) ("Because of the Act's emphasis on administrative regulation and enforcement, we conclude that 'it is highly improbable that "Congress absentmindedly forgot to mention an intended private action." ' ") (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 20, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979), quoting *Cannon v. University of Chicago,* 441 U.S. 677, 742, 99 S.Ct. 1946, 1981, 60 L.Ed.2d 560 (1979) (Powell, J., *dissenting* )).

It is clear that Congress created an inspection and certification system which enables the Secretary to enforce federal aircraft design standards.[14] The issue in

**11.** Prior to 1983, Section 404(a) made it the duty of air carriers to provide "safe and adequate service, equipment, and facilities." 49 U.S.C.A. § 1374(a). Effective 1 January 1983, the Deregulation Act repealed all of former section 404 of the Act, leaving intact the sole requirement that air carriers "provide safe and adequate" interstate air transportation. Pub.L. No. 95–504, 92 Stat. 1705, 1744 (currently codified at 49 U.S.C.A. § 41702).

**12.** Section 46107(a) provides in relevant part: The Attorney General may bring a civil action in a district court of the United States against a person to enforce section 40106(b) of this title. The action may be brought in the judicial district in which the person does business or the violation occurred.

**13.** 49 U.S.C.A. § 41101 provides in relevant part: (a) General.—Except as provided in this chapter or another law—(1) an air carrier may provide air transportation only if the air

carrier holds a certificate issued under this chapter authorizing the air transportation.

**14.** When the Secretary is satisfied, after investigation and testing, that a proposed aircraft or component is of proper design, material, specification, construction, and performance for safe operation, and meets the minimum standards, rules, and regulations prescribed by the Secretary, the Secretary may issue a "type certificate." 49 U.S.C.A. § 44702. When the Secretary is satisfied that duplicates of a type certified aircraft will be produced in conformity with the type certificate, he may issue a "production certificate." The Secretary may inspect or test aircraft for conformity with the type certificate. 49 U.S.C.A. § 44704(a). The registered owner of an aircraft may apply for an "airworthiness certificate." The Secretary certifies aircraft as airworthy only if he finds that the aircraft conforms to its type certificate, and, after inspection, is in condition for safe operation .... 49 U.S.C.A. § 44704(c).

this case, however, is whether Congress, in directing the Secretary of Transportation to promulgate federal aircraft design standards through the use of Advisory Directives, intended to preempt the potential application of additional safety measures via an injunction issued by a state court, in a case where the claims are wholly derived from state causes of action. In other words, the Court must decide whether a component manufacturer defendant (that has allegedly produced aviation hardware components unfit for the purpose for which they were intended) may use the FAA's regulatory presence in the field as a shield against a claim brought by a private claimant pleading entirely state causes of action. Before determining the scope and application of federal preemption in this case, the Court will briefly discuss the general tenets of field preemption law, as defined by the relevant precedents and statutory authorities pertaining thereto.

### 3. *Field Preemption*

Preemption may be either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. *See generally Public Health Trust of Dade County*, 992 F.2d at 294. Absent explicit preemptive language, the Supreme Court has recognized at least two types of implied preemption:

> field preemption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict preemption,

where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992) (citations and internal quotation marks omitted).

 Congress' power to preempt state law has its origin in the Supremacy Clause of Article VI of the United States Constitution. Federal law may therefore preempt state common law rules in the same ways as state statutes or regulations. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 2621, 120 L.Ed.2d 407 (1992); *Papas v. Upjohn Co.*, 985 F.2d 516, 517–18 (11th Cir.1993). "The purpose of Congress is the ultimate touchstone of preemption analysis." *Cipollone*, 112 S.Ct. at 2617.[15] Under the test set out in *Cipollone* state law is preempted by Federal law under the Supremacy clause where:

> (1) Congress, in a federal statute, explicitly states an intent to preempt state law; (2) in the absence of an express preemption, there is outright or actual conflict between federal and state law, thus, making compliance with both federal and state law in effect impossible; or (3) federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the states to supplement federal law.

*Id.* at 2621.

 Therefore, a federal question is presented when a suit "seeks injunctive

---

**15.** Some question seems to exist about what should be concluded when a state regulation which lies outside the scope of an express preemption provision (which, under *Cipollone*, implies that the state law is not preempted) nonetheless actually clashes with federal law (which traditionally has implied that the state law is preempted). *See Cipollone*, 112

S.Ct. at 2633 (Scalia, J., dissenting in part). The case at bar, however, presents no actual conflict. The FAA's Advisory Directive approves of the safety response plan envisioned by Defendant Teledyne, but nowhere requires that that response plan must be the exclusive means by which the alleged safety defects are identified and/or corrected.

relief from state regulation [ ] on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail...." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983); *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63–64, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987) ("One corollary of the well-pleaded complaint rule ... is that Congress may so completely preempt a particular area that any civil complaint raising this select group of claims is necessarily federal in character."); *Franchise Tax Bd.,* 463 U.S. at 24, 103 S.Ct. at 2854 ("[I]f a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arise under' federal law."). Complete preemption thus occurs when "the preemptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar,* 482 U.S. at 393, 107 S.Ct. at 2430 (*citing Metropolitan Life,* 481 U.S. at 65, 107 S.Ct. at 1547). Under these rare circumstances, "any claim purportedly based on that preempted state law is considered, from its inception, a federal claim." *Id.*

Where Congress has with words preempted some kinds of state lawmaking, courts are cautious about relying on implied preemption theories to limit state authority further. *See Public Health Trust of Dade County,* 992 F.2d at 294 (concluding from 49 U.S.C.A. § 1305 [currently codified as section 41713] that Congress did not intend to preempt state laws on matters unrelated to airlines' rates, routes or services). When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority,

> there is no need to infer congressional intent to preempt state laws from the substantive provisions of the legislation. Such reasoning is a variant of the familiar principle of expression *unius est exclusio alterius:* Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not preempted .... Therefore, [courts] need only identify the domain expressly preempted by each of those sections.

*Public Health Trust of Dade County,* 992 F.2d at pp. 294–95 (quoting *Cipollone,* 112 S.Ct. at 2618).[16]

The Court initially notes that "the [Supreme] Court has revisited the complete preemption doctrine only sparingly" and has found complete preemption only in the context of two federal statutes—the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141, *et seq.,* and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*

---

**16.** A majority of Justices in *Cipollone* agreed that implied preemption principles are usually inapplicable where the Act of Congress contains an explicit preemption provision. *See Cipollone,* 112 S.Ct. at 2618 (plurality opinion); *id.,* 112 S.Ct. at 2625 (Blackmun, J., concurring) ("Where, as here, Congress has included in legislation a specific provision addressing—and indeed, entitled—preemption, the Court's task is one of statutory interpretation—only to 'identify the domain expressly preempted' by the provision."); *cf. id.,* 112 S.Ct. at 2633 (Scalia, J., dissenting in part) (The proposition that "[o]nce there is an express preemption provision ... all doctrines of implied preemption are eliminated ... may be correct insofar as implied "field" preemption is concerned: The existence of an express preemption provision tends to contradict any inference that Congress intended to occupy a field broader than the statute's express language defines.").

*BLAB T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.,* 182 F.3d 851, 855 (11th Cir.1999). Furthermore, "although the Supreme Court recognizes the existence of the complete preemption doctrine, the Court does so hesitatingly and displays no enthusiasm to extend the doctrine into areas of law beyond the LMRA and ERISA." *Id.* at 856. Similarly, the Court has yet to find complete preemption outside the context of the LMRA and ERISA. *Id.*

In *BLAB T.V.,* which is the only Eleventh Circuit case to address directly the application of the complete preemption doctrine outside of the context of the LMRA and ERISA, the court discussed the various tests employed by other courts to determine whether complete preemption exists. *See id.* at 856–57 (concluding that the Cable Communications Policy Act did not completely preempt state law). Although refusing to adopt any particular approach, the justices summarized the various factors considered by other courts. They found that the cases revealed a varying emphasis on such questions as whether the state claim is displaced by federal law under an ordinary preemption analysis, whether the federal statute provides a cause of action, what kind of jurisdictional language exists in the federal statute, and what kind of language is present in the legislative history to evince Congress's intentions. *Id.* at 857. The justices in *BLAB T.V.* concluded that the focus of each of the tests was to:

> determine whether Congress not only intended a given federal statute to provide a federal defense to a state cause of action that could be asserted either in a

state or federal court, but also intended to grant a defendant the ability to remove the adjudication of the cause of action to a federal court by transforming the state cause of action into a federal [one].

*Id. (citation and quotation omitted ).* In other words, the "touchstone" of federal jurisdiction under the complete preemption doctrine is "Congress's intent." *Id.*

In the context of the FAA statute at issue in this case, as originally enacted, the Act contained no provision expressly addressing federal preemption of state efforts to regulate civil aviation. In the Deregulation Act of 1978, Congress added an explicit preemption provision to the general provisions of the original Act. That section provided:

> *Federal Preemption*
>
> (a) Preemption; 1) Except [for certain Alaskan intrastate air transportation], no State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier having authority under subchapter IV of this chapter to provide air transportation.

49 U.S.C.A. § 1305(a) (West Supp.1978) (now codified at 49 U.S.C.A. § 41713).[17]

The Act also contained a general remedies savings clause, which provided "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addi-

---

**17.** For background on the ADA amendments to the original 1958 Act, see H.R. Rep. 95–1211, 95th Cong., 2nd Sess. (1978), reprinted in 1978 U.S.C.C.A.N. 3737, 3752 (section 1305 intended to prevent states from filling void left by federal deregulation of airline

operations with conflicting and inconsistent state regulations); *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *Cleveland v. Piper Aircraft Corp.,* 985 F.2d 1438 (10th Cir.1993).

tion to such remedies." 49 U.S.C. § 1506, Pub.L. No. 85–726, *repealed* by 49 U.S.C. § 7(b), Pub.L. No. 103–272 (1994); *see* current codification at section 40120, *supra; cf. Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992) (construing section 1506 as a "general remedies savings clause," which, as a "relic of the pre-ADA/no preemption regime," does not supersede the specific preemption provision, currently codified at section 41713.).

The General Aviation Revitalization Act of 1994 ("GARA") amended the FAA Act to provide an eighteen-year Federal statute of repose on civil actions for death or injury, or damage to property, relating to general aviation aircraft and their component parts. *A "Tail" of Liability Reform: General Aviation Revitalization Act of 1994* ("GARA"), Timothy S. Mcallister; *1995 Symposium on the General Aviation Revitalization Act,* 23 Transp. L.J. 301, 312. Although Plaintiff in this case does not indicate that he or his aircraft suffered an accident as a result of Defendant Teledyne's manufactured components, it is relevant here for purposes of preemption to address the statute's effect on state law.

General aviation aircraft are broadly defined under GARA as all aircraft (unpowered, single-engine, or multi-engine; piston, turbine or jet; and fixed or rotary-winged) holding a valid FAA type or airworthiness certificate, carrying fewer than twenty people, and not engaged in passenger carrying operations at the time of the accident. *Id.* GARA provides four major exceptions. The eighteen-year statute of repose does not apply to cases in which: (1) the manufacturer misrepresents certain safety information to the FAA, (2) the claimant was a passenger for purposes of receiving medical or emergency treatment, (3) the claimant was not aboard the aircraft, and (4) actions are brought under

manufacturer's written warranties. *Id.* at 312–13.

The purpose of GARA is two-fold. First, it seeks to provide the opportunity to restart large scale production of light piston general aviation aircraft in order to create jobs and exports. Second, GARA avoids fundamental reform of the tort system. In other words, it does not preempt state law: " ... [I]n cases where the statute of repose has not expired, state law will continue to govern fully, unfettered by Federal interference." H.R.Rep. No. 103–525, 103d Cong., 2d Sess., pt. 2, at 6–7 (1994). Arguably, GARA resolves the component hardware preemption question by definitely addressing the statute of repose's relationship to other laws and the issue of the scope of Federal preemption of State law in the area of products liability actions. See 49 U.S.C. § 40101, *supra.* GARA § 2(d) provides: "[t]his section supersedes any state law to the extent that such law permits a civil action described in subsection (a) to be brought after the applicable limitation period for such civil action established by subsection (a)." *Id.* Thus:

> Congress gave the various courts a definitive expression of federal legislative intent. It did so by failing to address federal preemption of state tort actions for aircraft accidents and by specifically preserving any and all state law not superseded. GARA § 2(d), in company with preservation of the 49 U.S.C. § 40120(c) general "savings clause," may thus be read as clarifying the scope and strengthening the role of state tort law applicability to aviation products liability actions.

*A "Tail" of Liability Reform,* 23 Trans. L.J. at 313.

49 U.S.C.A. § 40120(c), as amended, is consistent with the "legislative intent of the FA Act that state tort remedies and

the law governing these remedies ... are not preempted by Federal statute." *Id.* at 314. GARA thus affirmatively preserves a role for state law, which continues to govern the adjudication of aviation products liability cases involving claims for defective design or manufacture. *Id.* The House Committee on the Judiciary was very careful to emphasize that it was voting the bill out of the committee as

> a very limited Federal preemption of State law which should be viewed as a narrow and considered response to the perceived liability crisis in the general aviation industry ....[R]ather than seeking to revise substantially a number of substantive and procedural matters relating to State tort law, [it] is limited to creating a statute of repose.

H.R.Rep. No. 103–525, *supra*, at 4, 6 (citations and quotations omitted).

### 4. *Field Preemption not Applicable to Plaintiff's Claims*

Turning specifically to Teledyne's assertion that Congress has shown an intent to preempt the potential application of all state-based remedies in the field of aviation hardware, it is clear from the caselaw and legislative history, *supra*, that this claim must fail. Examining the factors considered by the Eleventh Circuit in *BLAB T.V.*, the Court finds that the complete preemption doctrine does not provide a basis for federal jurisdiction in this case. A review of the statute and its accompanying legislative history reveals that complete preemption was not intended. In its grant to the FAA of exclusive regulatory power over airlines' "rates, routes or services," *see* U.S.C.A. § 41713, Congress surely must have recognized that preemption of many state regulations would occur. Yet the Defendant has not shown, and the Court's research has not uncovered, any indication that either Congress or the FAA intended thereby to fully occupy the field, such that no state remedies could apply in areas not affecting such rates, routes or services. *Id.*

Further, the existence of the "savings clause" in GARA rebuts Teledyne's argument that Congress, through the FAA, intended to completely preempt state law in the field of aviation hardware safety. Clauses like those are not the language of complete preemption, but are instead inconsistent with it. As stated in *BLAB T.V.*, the existence of this type of "savings" clause which "contemplate[s] the application of state-law and the exercise of state court jurisdiction to some degree ... counsels against a conclusion that the purpose behind the ... Act was to replicate the 'unique preemptive force' of the LMRA and ERISA." 182 F.3d at 857–58. Defendant has not pointed to any provision in the Act itself or in its legislative history which would indicate "that Congress intended state law causes of action within the scope of [the Federal Aviation Act] to be federalized." *Sanderson, Thompson, Ratledge & Zimny v. AWACS, Inc.*, 958 F.Supp. 947, 958 (D.Del.1997) (finding no complete preemption in context of the Communications Act).

The Court thus finds that Plaintiff's request for injunctive relief is not subject to the complete preemption exception to the well-pleaded complaint rule. Consequently, there are no complete preemption grounds for asserting subject matter jurisdiction over this action.

### 5. *Ordinary Preemption*

 Defendant's final argument is that "the relief sought by plaintiff (removal and magnaflux examination of all affected TCM crankshafts) conflicts directly with the AD from the FAA requiring compliance with the CSB." Defendant's *Notice of Removal*, p. 4. Specifically, Defendant asserts that by requesting specific metallurgical tests on the alleged faulty aircraft

components, a set of diagnostic measures which necessarily entails a more detailed component inspection than that contemplated by the FAA's AD, Plaintiff has created a preemption conflict which only this Court may resolve. Although the Court has already determined that the complete preemption doctrine does not apply in this case, it is important to note the Eleventh Circuit has recognized that use of the term "preemption" in this context has caused "a substantial amount of confusion between the complete preemption doctrine and the broader and more familiar doctrine of ordinary preemption." *BLAB T.V.*, 182 F.3d at 854. That such confusion exists, however, does not render a state court without jurisdiction to hear and adjudicate claims that may potentially be defeated by a federal preemption defense. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1313 (11th Cir. 2001) ("it is worth pointing out that complete preemption functions as a narrowly drawn means of assessing federal removal jurisdiction, while ordinary preemption operates to dismiss state claims on the merits and may be invoked in either federal or state court.")(*citations and quotations omitted*).

In other words, the conclusion that the complete preemption doctrine does not provide a basis for federal jurisdiction in this action does not preclude the parties from litigating about the preemptive effect, if any, of the FAA's Advisory Directive on the Plaintiff's claims for relief in any subsequent state court action. That such an issue may be litigated, and even invoked by the Defendant as a federal preemptive defense does not, however, bestow federal question jurisdiction on this action, as "[s]tate courts are competent to determine whether state law has been preempted by federal law and they must be permitted to perform that function in cases brought before them ...." *Railway Labor Executives*, 858 F.2d at 942

## III. CONCLUSION

Plaintiff's *Complaint* relies exclusively on state law causes of action. It does not on its face allege any basis for federal jurisdiction. Accordingly, under the well-pleaded complaint rule, the substance of the *Complaint* does not permit removal to federal court. As the Court has determined, the amount in controversy sufficient to establish diversity jurisdiction has not been met in this case. Therefore, Teledyne could have properly removed this case only if Plaintiff's state law claims are rendered federal in nature under either the doctrines of complete or ordinary preemption. As demonstrated above, neither doctrine is applicable to the matter at hand.

In addition to the state law claims for negligence, misrepresentation and breach of warranty, Plaintiff's *Complaint* in this case seeks injunctive relief against Defendant Teledyne in the form of a mandatory request for the detailed inspection of select aircraft components manufactured by Defendant. Plaintiff does not request that the state court either review or alter the regulatory decision of the FAA as manifested in its Advisory Directive, contrary to Defendant's attempts to characterize Plaintiff's pleadings as such. Rather, any question concerning the FAA's regulatory authority in this area of law arose only from Teledyne's defensive assertion of the purported preemptive effect of the FAA's regulatory activity on Plaintiff's request for injunctive relief. As the mere existence of a federal defense, even one involving federal (ordinary) preemption, cannot serve as the basis for federal subject matter jurisdiction, it follows that Defendant has improperly removed this matter to federal court. See *Caterpillar*, 482 U.S. at 393, 107 S.Ct. at 2430.

Likewise, there is simply no foundation to support Teledyne's claims that the pre-

emption provision of the Aviation Act, 49 U.S.C.A. § 41713, indicates that Congress has chosen to occupy the field "so thoroughly ... as to make reasonable the inference that Congress left no room for the states to supplement federal law." *Cipollone*, 112 S.Ct. at 2621. As noted above, the preemption provision in this context merely creates a potential federal defense to Plaintiff's claims under state law, which the state court is more than capable of resolving under the doctrine of ordinary preemption. Further, the fact that the Aviation Act contains a provision preempting claims under state law which would affect airlines' rates, routes or services, *see* 49 U.S.C.A. § 41713, does not under the principles of complete preemption described above "create" removal jurisdiction. To the contrary, the Aviation Act does not contain the extraordinary preemptive force necessary to render Plaintiff's state claims federal in nature and removal proper.

Plaintiff, as the master of his claim, has successfully pleaded state law claims and is entitled to litigate his claims in state court, the forum of his choice. While his claim for injunctive relief may ultimately prove to be preempted by section 41713 of Title 49, the ordinary preemption issue is most appropriately decided by the state court and is not addressed here. *See Franchise Tax Board*, 463 U.S. at 3–4, 103 S.Ct. at 2843–2844 (given inapplicability of complete preemption doctrine, lower federal courts had no jurisdiction to decide whether state claims were preempted by ERISA); *Krashna v. Oliver Realty, Inc.*, 895 F.2d 111, 115 n. 7 (3rd Cir.1990) ("We need not consider the viability of this state claim nor whether ordinary preemption operates against it. These are matters for the state court."). For the foregoing reasons, the Court concludes that it lacks subject matter jurisdiction over this action. The court therefore **REMANDS** this matter to the Circuit Court of Mobile County, Alabama. The clerk· is **DIRECTED** to take all steps necessary to effectuate this remand, each party to bear its own costs.